**MARINE MIDLAND BANK**

v.

**The UNITED STATES.**

No. 308–81C.

United States Court of Claims.

Aug. 25, 1982.

---

George H. Roberts, Jr., Harrisonburg, Va., attorney of record, for plaintiff. Ronald D. Hodges and Wharton, Aldhizer & Weaver, Harrisonburg, Va., of counsel.

William Douglas White, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Anthony Sadowski, Dept. of Defense, of counsel.

Before FRIEDMAN, Chief Judge, and KASHIWA and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge, delivered the opinion of the court:

This case presents several difficult and interesting questions of first impression: (1) under the standard "title vesting" clause for federal procurement contracts, what is the nature of the interest taken by the government to secure its progress payments to a contractor, and (2) upon the insolvency of a contractor to which such payments

have been made, what is the resolution of the conflict between that interest and a floating lien security interest of a general creditor of the contractor? The case is now before the court on cross-motions for summary judgment, and there has been briefing and oral argument. We conclude: (1) that the government takes an interest in the nature of a lien, and (2) that such lien is paramount to private floating liens. As will be explained fully below, since the collateral in this case did not have value in excess of the government's lien interest, this results in a holding for defendant.

On December 20, 1977, Bond Trailer Division, Inc., a Virginia company, executed a written guarantee to plaintiff Marine Midland Bank to pay certain indebtedness to plaintiff of a third party. Bond secured this guarantee by executing a floating lien security interest[1] in favor of plaintiff, allegedly perfected by plaintiff under applicable state law by January 9, 1978.

Bond was exclusively a government contractor, engaged in the production of munition trailers for the Air Force and the Navy. Bond's two contracts with the Air Force were dated June 30, 1976, and March 3, 1978, and its contract with the Navy was dated May 9, 1978. All three of these contracts, whether by their original terms or by amendment, included a clause which provides that upon the government's making of progress payments title shall "forthwith vest" in the government:

> to all parts; materials; inventories; work in progress * * * theretofore acquired or produced by the Contractor and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices * * * [and] to all like property thereafter acquired or produced by the Contractor as aforesaid * * * upon said acquisition, production or allocation.

This clause is from federal procurement regulations, 32 C.F.R. § 163.79–2 (1981), and pertinent parts thereof are included as an appendix to this opinion.

The dispute in this case arose when the party for which Bond was acting as guarantor defaulted under its obligations to plaintiff. Upon plaintiff's subsequent demand upon Bond, and Bond's refusal to pay, plaintiff instituted proceedings in May 1979, in state court in Virginia, to obtain physical possession of Bond's collateral. This basically was its plant and all of its inventory, as covered by the floating lien. In June 1979, however, the United States intervened in the state proceedings, claiming that plaintiff could not take possession of the inventory because it belonged to the government pursuant to the title vesting clauses in its contracts. The case was then removed to the United States District Court for the Western District of Virginia. Those proceedings were stayed in their turn when Bond initiated bankruptcy proceedings in the bankruptcy court in that district, and the result of that action, as pertinent to the case as it now stands before this court, was that the property claimed both by plaintiff and the government was abandoned by the bankruptcy court under an agreement between plaintiff and defendant that defendant would take possession of the inventory subject to defendant's payment of $250,000 should it be judicially determined that plaintiff's security interest was paramount to the interest asserted by the government. The district court then transferred the case here for that determination.

▮ As a preliminary matter, we note that it is indisputable that physical possession of Bond's inventory is properly with the government. *United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910). Especially when defense procurement is involved, the government's title vesting provisions certainly operate to prevent the actual possession of goods contracted for by the government from passing to anyone else. *United States v. Digital Prod. Corp.*, 624 F.2d 690 (5th Cir. 1980); *In re American Boiler*

---

1. Such an interest covers not only the debtor's present plant, machinery and inventory but also attaches to after-acquired property. The lien "floats" over whatever the debtor has or acquires.

*Works, Inc.*, 220 F.2d 319 (3d Cir. 1955). It is also indisputable that the government's taking of possession put the collateral beyond the reach of any interest that plaintiff may have had. "[Government] property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the Government." *Ansonia Brass & Copper Co.*, 218 U.S. at 471, 31 S.Ct. at 54. Plaintiff claims, however, that the extinction of its interest in the collateral is compensable as a fifth amendment taking, under the rule of *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (where the government takes title to property, to which a valid lien had attached, the lien is extinguished and its value is recoverable in an action for taking).

## I

Of initial, and critical, importance in this case is the nature of the interest taken by the government for its payment of progress payments. If the government took title to Bond's inventory, in the traditional sense, then it becomes important whether plaintiff's lien attached before title vested. If so, then plaintiff's interest was compensably taken, under *Armstrong*. If not, then plaintiff's lien never actually had anything to attach to because the property belonged to the government. Plaintiff would have no recovery in that situation. If, however, the government took a lien interest, instead of traditional title, then the next question becomes one of priorities, whether it is the government's lien or plaintiff's that is paramount. These are widely divergent lines of inquiry.

Defendant argues that the plain meaning of its title vesting clause is that the government takes title in the traditional sense, that the government simply owns inventory subject to the operation of the clause. Plaintiff, on the other hand, argues that a full reading of the clause, and of the regulations that govern its use, shows that the government means only to take a security interest to secure its progress payments, and that title in the traditional sense is not contemplated at all.

■ Plaintiff's assertion is the correct one. As will be made clear, the progress payments in this case were loans from the government to Bond, to be repaid by withholding an appropriate amount of the contract price ultimately owing on full performance. In the interim, the government took an interest in Bond's inventory as security, as defined by the title vesting clause. This interest was far less than full ownership.

The title vesting clause comes from 32 C.F.R. Part 163, entitled "Defense Contract Financing Regulations," which implements the authorization under 10 U.S.C. § 2307 (1976) for agencies to make advance, partial, progress and other payments to government contractors.[2] The regulatory structure that Part 163 sets up is a detailed and complex framework for advancing funds to contractors under appropriate guidelines and protections. The goal of the system, as articulated in Subpart B—"Basic Policies" is "[t]he providing of funds for payment of expenses of performance of contracts [as] an essential element of defense production." Section 163.18. Further, "Prudent contract financing supports procurement and production * * * by providing necessary funds to supplement other funds available to contractors for contract performance." *Id.* Recognizing the risks inherent in loaning money, however, the regulations provide that such financing must be designed to minimize monetary loss to the government. Section 163.19. The various types of advance payments are granted only in a set order of preference, all of which succeed private financing on reasonable terms, section 163.22, and financing is not allowed at all unless the contractor appears properly creditworthy. Sections 163.24 and 163.27.

---

**2.** Without this statutory authority some such payments, and perhaps all such, would violate the prohibition on advances of public money, codified at 31 U.S.C. § 529 (1976). *See* C.S.

McClelland, *The Illegality of Progress Payments as a Means of Financing Government Contractors*, 33 Notre Dame Law. 380 (1958).

Financing through progress payments is conditioned on use of the title vesting clause at issue in this case. Section 163.79. "Title" to a contractor's inventory is taken by the government to secure the advance of progress payments, which the contractor repays by having the sum of the progress payments deducted from amounts due upon final performance. Sections 163.81 and 163.81–3. While defendant argues that this scheme has the government "buy" a contractor's inventory with its progress payments, this is not how the regulations read. Progress payments are made, and then they are "liquidated" by decreasing the contract price. *Id.* They are not partial purchases, but loans.[3]

This conclusion is reinforced by the text of the title vesting clause itself,[4] which makes clear that the government does not take ownership to the covered inventory in any normal sense of the word. According to paragraph (d) of the clause: (1) title transfer does not affect the "handling and disposition" of covered property under other sections of the contract; (2) production scrap may be sold without the government's approval; (3) upon completion of the contract, title will revest in the contractor to any covered materials that were not incorporated into the final product; and (4) the government will accept no inventory-related liability for the covered inventory. Paragraph (e) of the clause keeps the risk of loss on the contractor unless expressly assumed by the government, and paragraph (h) allows the government, upon declaring default, to force the revesting of inventory in the contractor by compelling the repayment of progress payments. "Title" is meant to carry no risks for the government and is shifted back to the contractor when it would be unneeded or undesired. In short, the government takes an interest in the contractor's inventory but does not want, and does not take, any of the responsibilities that go with ownership.

The question raised, then, is what title vesting means for the purposes of the government's financing program, when it is evident that "title" is not used literally in the title vesting clause or the regulations. Indeed it would do violence to the system that the clause and regulations set up to say that the government "owns" covered property when it is apparent that the government specifically exempts itself from most of the incidents of ownership. Reading the clause and all of the regulations together, it is plain that ownership is not taken, but rather that the government takes a security interest in the contractor's inventory, to secure the funds loaned to the contractor through progress payments. Such an interest is readily identifiable in common parlance as a lien, as plaintiff argues, despite the use of the term "title."

By way of rebuttal, defendant presses on this court a number of cases in which courts seem to have read "title" for its plain meaning, and suggests that these cases be followed here. We read some of these cases, however, to involve only the special right of the government to take possession of property that it has contracted for and not to involve any of the general aspects of title as the word is commonly used. Such cases should not be read for more than what they are. Other cases show only why the government originally chose and used the word "title," for legal settings that are no longer current, and we do not find them to have present applicability. None of these cases deals with title as ownership, and none of them is inconsistent with deciding in the case before us that the government took a lien on Bond's inventory, as measured by the progress payments advanced to Bond.

The most readily explained of the government's cases are those which do not involve any competing claims in the value of prop-

---

**3.** Note also that "When deemed reasonably necessary for the protection of the Government, the [title vesting clause] may be supplemented by additional protective provisions, such as personal or corporate guarantees, subordinations or standbys of indebtedness, spe-

cial bank accounts, and other protective covenants * * *." 32 C.F.R. § 163.80–5. Such language is not consistent with a purchase theory.

**4.** Reprinted as an appendix to this opinion.

erty that the government has contracted for and only involve the government's right to the physical possession of that property upon the bankruptcy of the contractor. As we have said earlier, the government's right to possess such property cannot be questioned, and it is entirely accurate and appropriate for an opinion in a case that is solely on possession to recite that "title means title." The possessory aspect of traditional title is indisputably encompassed by "title" as it is used in the title vesting clause, at least to insure possession upon a contractor's insolvency, but these cases say nothing on whether other attributes of traditional title are also encompassed by the term. No other issue than mere possession is present. We see that it involves no inconsistency to say that "title" under the title vesting clause gives the government a possessory right and still to leave open whether another party must be compensated for a lost interest.

An illustration of a case purely on possession is *United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed.2d 1107 (1910), where workmen's and materialmen's liens were argued as validly attaching to a ship, built by a contractor that had become insolvent, to which the government had taken title. This argument was rejected with the passage quoted earlier in this opinion, that no interest deriving from a sovereignty other than the United States can be forced onto United States property without the government's consent. *Id.* at 471, 31 S.Ct. at 54. The Supreme Court was clear that the government's actual possession of the ship could not be interfered with, and for that purpose the government's "title" included a possessory right. It is important, however, that the value of the workmen's and materialmen's liens was not a part of the case—only whether those liens could attach to government property. The Court was not presented with an argument that the extinction of the liens upon the government's possession of the ship was compensable as a taking, such as plaintiff argues in the present case, and the Court's opinion should not be read to indicate any negative inference. *See*

*Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (explaining this aspect of *Ansonia*).

Similar cases, involving only possession, are ones between the government and a bankrupt contractor's trustee in bankruptcy, when the trustee attempts to sequester property that is covered by a title vesting clause. Such attempts are perfunctorily dismissed because the government's right to the physical possession of such property simply cannot be defeated. *See United States v. Digital Prod. Corp.*, 624 F.2d 690 (5th Cir. 1980); *In re American Boiler Works, Inc.*, 220 F.2d 319 (3d Cir. 1955). In none of these cases, however, is there an issue of the value of the property, and they have no applicability to the case now before us, where plaintiff does not dispute the government's possession of Bond's inventory and claims only under the fifth amendment that the government's possession has resulted in a taking of the value of its loan.

Another category of cases argued by the government is represented by *Boeing Co. v. United States*, 168 Ct.Cl. 109, 338 F.2d 342 (1964), *cert. denied*, 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 269 (1965). Although the particular legal issue in *Boeing* involved the tax consequences of title vesting, the opinion includes a discussion of "title" as lien, which characterization is rejected in favor of a more literal reading of title. While this seems directly contrary to the conclusion reached in the present case, *Boeing* comes from a legal setting in which it was necessary to characterize title vesting fairly literally in order to preserve the legality of the government's practice of making progress payments, and this explains the difference. To understand *Boeing* properly is to begin to understand why the word "title" was originally chosen by the government and why a literal reading no longer makes sense.

In 1823 Congress enacted a strict prohibition on advances of government funds, Pub. L.No. 17–9, 3 Stat. 723, and it is still on the books, in only slightly amended form, at 31 U.S.C. § 529: "No advance of public money shall be made in any case unless authorized

by the appropriation concerned or other law." For the field of government contracts, the plain result of this prohibition was to ban advance payments, partial payments, progress payments and other types of payments advanced to contractors before contract completion, and a way around it became necessary if such payments were to be made, as difficult procurements seemed at times to require. The government's title vesting program was developed as the answer, conditioning progress payments on the vesting of title, on the theory that there was no "advance" of public money if the government took something of value for its payments. And it was important to this system to construe the government's vesting of title literally, in order to make progress payments look like partial purchases. *See* C. S. McClelland, *The Illegality of Progress Payments as a Means of Financing Government Contractors*, 33 NOTRE DAME LAW. 380 (1958).

In 1948, however, Congress began to narrow the prohibition, by enacting a specific exception to allow advance payments to contractors on negotiated contracts for military procurement. Armed Services Procurement Act of 1947, Pub.L.No. 80–65, 62 Stat. 21. This was followed one year later with a very similar provision for nonmilitary procurement, Federal Property and Administrative Services Act of 1949, Pub. L.No. 81–288, 63 Stat. 377 (1949), and finally, in 1958, Congress wholly abrogated the prohibition by broadening the allowance to progress payments, partial payments and other payments and by extending the coverage to advertised contracts as well, both military and nonmilitary. Pub.L.No. 85–800, 72 Stat. 967 (codified at 10 U.S.C. § 2307 and at 41 U.S.C. § 255).

The 1958 enactment, then, removed the reason that title vesting had been construed literally before, because it removed the need to make progress payments appear like partial purchases. The 1958 Act cleared the way for just the type of examination of the title vesting clause and regulations that we engaged in earlier in this opinion, to determine exactly the kind of interest that the government has provided for itself. That examination concluded that the interest plainly is not ownership and has the nature of a lien. Thus, although we understand why the word "title" is used in the clause, for what was once a very important purpose, we see no present reason to call the government's lien interest anything other than what it is, as the clause and regulations show it to be.

This background explains *Boeing*, which involved contracts dated before the 1958 legislation, and so a literal reading of "title" for the purposes of title vesting was still necessary. We only need note for the present case that the contracts were entered into after 1958 and that it would not be reasonable to read the present title vesting clause and supporting regulations literally at all, as we have discussed at length above.

The government presses another case, *In re Double H Prod. Corp.*, 462 F.2d 52 (3rd Cir. 1972), which also seems to read title vesting according to a plain meaning, even though it deals with post-1958 contracts. *Double H* is much like the present case, involving the government and a floating lien creditor of a bankrupt contractor, and the opinion rejects an argument that the government's interest should have a lien characterization. We read *Double H*, however, to do no more than to illustrate yet another ground on which the government's use of the word "title" was important, but now is largely outdated.

The revised version of Article Nine, "Secured Transactions," of the Uniform Commercial Code was put forth only 10 years ago, and it has received widespread acceptance only in the last 5 years.[5] One of

---

5. Article Nine of the U.C.C. is used here only as the most complete and recent exposition of secured transactions law and theory. It is not binding on the federal government, in any case in which federal law controls, unless adopted by a court as a source for federal rules of decision, if no statute applies. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *John C. Kohler Co. v. United States*, 204 Ct.Cl. 777, 498 F.2d

the principal reforms of the new Article Nine was the establishment of a coordinated system for setting the priority of competing security interests, and it eliminated the need for many of the fictional devices that were used to circumvent certain inequities and inconsistencies in the old system. It is one of these now outmoded devices that concerns us.

■ Before Article Nine's changes, a lien interest taken by a purchase money lender [6] often was subordinated to the floating lien interest of a pre-existing general creditor. This was unfair, however, because the value that the purchase money lender added to the debtor was not expected by the general creditor to be available as collateral—it was not present in the debtor when the general creditor calculated the amount of its loan— and it was a windfall for the law to make it subject to the general creditor's interest. It would have worked no harm to the general creditor to allow the purchase money lender simply to take out of the debtor just what it put in, thus putting the general creditor back in the position it was in when it made its loan, but it often destroyed the purchase money lender's interest to have the general creditor's interest come first.

As Comment 3 to U.C.C. § 9–312 explains, purchase money lenders then had to resort to fictional devices, and a title device was most common:

> Prior law, under one or another theory, usually contrived to protect purchase money interests over after-acquired property interests * * *. For example, in the field of industrial equipment financing it was possible, by manipulation of title theory, for the purchase money financer of new equipment (under conditional sale or equipment trust) to protect himself

against the claims of prior mortgagees or bondholders under an after-acquired clause in the mortgage or trust indenture: the result was arrived at on the theory that since "title" to the equipment was never in the vendee or lessee there was nothing for the lien of the mortgage to attach to.

We note that this is closely analogous to the government's position in the present case, where the government has paid money into a debtor for a specific purpose and has taken back "title" in whatever is identified to that purpose. Defendant's briefs are full of assertions, in arguing against the validity of plaintiff's lien interest, that since "title" to the contractor's inventory was vested in the government, there was nothing to which plaintiff's lien could attach. Clearly, the government simply is arguing an old title device.

Article Nine's reform of this situation is to allow purchase money lenders to come ahead of general contractors, section 9–312, and more generally to treat title devices and lien interests alike, recognizing that there is no difference in the effect that they are intended to have. Section 9–202 specifically makes title to collateral immaterial: "Each provision of this Article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." And the Comment to section 9–101 reinforces this: "Rights, obligations and remedies under the Article do not depend on the location of title (Section 9–202). * * * The scheme of the Article is to make distinctions, where distinctions are necessary, along functional rather than formal lines." [7] Thus *Double H* is explained, as a case on the common pre-Code practice of using a title device to

---

1360 (1974); *Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 419 F.2d 425 (1969).

**6.** A purchase money lender is one who loans money for the acquisition of particular property and who takes back an interest only in that property.

**7.** Very importantly, this comment also recognizes that "[t]he location of title may become

important for other purposes—as, for example, in determining the incidence of taxation—and in such a case the parties are left free to contract as they will." This seems directly to support our previous discussion on cases involving only the government's right to possess an insolvent contractor's inventory. For the purpose of possession, "title" is a good concept and should be given effect.

avoid the inequity of giving priority, in property covered by a special loan of money, to a general creditor who would take such an interest as a windfall. This device is no longer necessary, however, given the new common understanding and treatment of purchase money interests.

Both parties also discuss the significance of *In re Murdock Mach. & Eng'r Co.*, 620 F.2d 767 (10th Cir. 1980), a case which dealt with the attempts of a government contractor's supplier to halt the delivery of steel, while still in transit, upon the supplier's discovery that the contractor had become insolvent. The dispute in the case was between the supplier and the government, with the government claiming that title to the steel had vested in the government pursuant to a title vesting clause and that it was therefore entitled to take the steel without payment. The Tenth Circuit resolved the case by finding: (1) on the special facts before it, that the state enactment of U.C.C. Article Nine applied [8] and (2) that the closest analogue in Article Nine was to the right of a supplier to halt deliveries as against the interest of a good faith purchaser for value. The supplier in *Murdock* was found to have that right, and the government was required to pay.

*Murdock* may seem applicable to the present case, in the analogy between the government, under its title vesting clause, and a good faith purchaser for value, because this would seem to have more in common with a "title" characterization of the government's interest under title vesting than a "lien" characterization. Apart from the great difference in the factual situation, however, which alone may be enough to distinguish *Murdock*, there is a more fundamental difference. The Tenth Circuit was faced with the task of fitting the government's title vesting practice into the complex and self-contained system of Article Nine, and it chose the good faith purchaser for value analogy as the best it could find. While this may well have been the best "fit" under the circumstances, we are not sure that it should have any applicability outside of Article Nine. As explained fully below, the federal common law, and not Article Nine, governs the present case, and construing title vesting for its purposes is very different. We do not have to fit title vesting into a system in which it was never intended to be a part. Rather we can read the government's title vesting clause and regulations for what they really are written to be, a very reasonable financing structure using paramount liens to secure progress payments. *Murdock* and our case do not conflict. The court in *Murdock* focused on the peculiar circumstances involving an innocent seller of goods to an insolvent contractor rather than on the overall problems of government procurement. It did not focus on nor did it rule on the validity of the title vesting clause as between a floating lien holder and the government.

In sum, we hold that the government's title vesting clause and regulations provide for the taking of an interest in the nature of a lien. Full title, in the plain sense, certainly is not meant, as an examination of the clause and regulations show. We recognize that the government's use of the word "title" has had an important history, both to avoid the ban on advances of public

---

**8.** The Tenth Circuit found a very strong state interest in protecting suppliers from "hidden" government title, finding that it would be a great burden for suppliers always to have to ask if a buyer were a government contractor. *Murdock*, 620 F.2d at 772–73. As will be made clearer by our discussion of *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), in part II of this opinion, this created a strong argument for the selection of state law as the rule of decision for the case. Our case, however, does not involve a mere supplier, who may well only deal with a government contractor as one of many other-

wise identical orders received on any given day. We are dealing with a lender, part of whose job is to become familiar with a prospective debtor's operations. The burden on suppliers that the Tenth Circuit found so important is not a burden on lenders, and so we do not find the discussion of *Kimbell Foods*, in *Murdock*, to be helpful in our case. We note, also, that the court in *Murdock* said specifically that: "The government has not argued in this case that its procurement programs demand a uniform federal commercial law." 620 F.2d at 772. This too makes it quite unlike the case we decide here.

money and as a way to circumvent floating lien interests of general creditors, and that it has an important present use in insuring that the government may take actual possession of the inventory of a bankrupt contractor. There is no reason, however, in theory or in case law, to read the word for more than that.

## II

■ The second major question in this case is which of the conflicting security interests in the value of Bond's inventory, the government's or the plaintiff's, should take priority. That such a question of priorities is one of federal law was settled in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). The only remaining issue is what the federal rule of decision should be.

The question in *Kimbell Foods* involved the conflicting security interests of private lenders and certain government agencies, the Small Business Administration (SBA) and the Farmers Home Administration (FHA). This was a question of federal common law, since the Court decided that federal law should control the ordering of priorities but also since no statute did so. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). In choosing the source of the federal rule of decision, the Court made reference to the standard practice of both the SBA and the FHA of conforming many functions to state practice and noted that general commercial lending schemes would be greatly upset if those agencies were not also to follow state laws in their lending programs. Since the Court saw little reason for federal uniformity, it concluded that the state enactments of Article Nine would be used as the federal law for the case.

*Kimbell Foods* specifically left open, however, the ability to fashion uniform rules in cases that required it. "Of course, formulating special rules to govern the priority of * * * federal * * * liens * * * would be justified if necessary to vindicate important national interests." 440 U.S. at 740, 99

S.Ct. at 1464. And especially where state practices would not be affected by such a uniform federal rule, it is entirely reasonable and appropriate to impose one. *See id.* at 739–40, 99 S.Ct. at 1464.

The case before us clearly calls for a uniform rule of decision. Government procurement is not carried out from small regional offices, as the functions of the SBA and FHA often are, and individual state practices generally are not followed. Quite to the contrary, it is one of the primary purposes of the extensive and detailed regulations for federal procurement to promote standardization and uniformity throughout the federal system. Indeed, specifically for the purposes of the present case, it was the explicit desire of Congress itself, when it enacted the 1958 authorization for advance, progress, partial and other payments, that "uniform government-wide regulations * * be developed to guide the exercise of the * * * advance payment (and progress payment) authority." [1958] U.S. CODE CONG. & AD. NEWS 4021, 4027. This desire is reflected in the implementing regulations at 32 C.F.R. § 163.16: "Uniform financing policies and, so far as practicable, uniform procedures and standard forms are to be used by the Departments * * *." Thus it is clear that *Kimbell Foods'* resort to state laws would not be appropriate in this case, as contrary to evident congressional intent and established federal practice.

■ The rule of decision we choose for this case is to make the government's security interest under its title vesting procedures paramount to the liens of general creditors. We believe that this merely follows the modern practice of giving priority to purchase money interests, as we consider purchase money to be closely analogous to the government's progress payments, and we lay down nothing new or unexpected. The government should be able to take out of the contractor the value that it has put in, if that value is identified with specific property, and it does not hurt a general creditor if this is done.[9] We note also that

---

9. Not, at least, if the general creditor is pre-existing, because this would merely leave the

giving the government an interest only to the extent of its progress payments prevents the government from taking possession to more value than it has put into the contractor.

██ In this case, since it appears from uncontested facts that the government's security interest in Bond's inventory was not fully satisfied, there is no excess value to satisfy plaintiff's lien.

Accordingly, plaintiff's motion is denied. Defendant's motion is granted. The petition is dismissed.

### APPENDIX

32 C.F.R. § 163.79–2 Progress payment clause for small business concerns.

#### PROGRESS PAYMENT FOR SMALL BUSINESS CONCERNS

#### (JANUARY 1972)

Progress payments shall be made to the Contractor as work progresses, from time to time upon request, in amounts approved by the Contracting Officer upon the following terms and conditions:

(a) *Computation of Amounts.* (1) Unless a smaller amount is requested, each progress payment shall be (i) eighty-five percent (85%) of the amount of the Contractor's total costs incurred under this contract plus (ii) the amount of progress payments to subcontractors as provided in (j) below; all less the sum of previous progress payments.

(2) The Contractor's total costs ((a)(1)(i)) shall be reasonable, allocable to this contract, and consistent with sound and generally accepted accounting principles and practices. However, such costs shall not include (i) any costs incurred by subcontractors or suppliers, or (ii) any payments or amounts payable to subcontracts or suppli-ers, except for completed work (including partial deliveries) to which the Contractor has acquired title and except for amounts paid or payable under cost-reimbursement or time and material subcontracts for work to which the Contractor has acquired title, or (iii) costs ordinarily capitalized and subject to depreciation or amortization except for the properly depreciated or amortized portion of such costs.

(3) The amount of unliquidated progress payments shall not exceed the lesser of (i) 85 percent of the costs mentioned in (a)(1)(i) above, plus any unliquidated progress payments mentioned in item (a)(1)(ii) above, both of which are applicable only to the supplies and services not yet delivered and invoiced to and accepted by the Government, or (ii) 85 percent of the total contract price of supplies and services not yet delivered and invoiced to and accepted by the Government, less unliquidated advance payments.

(4) The aggregate amount of progress payments made shall not exceed 85 percent of the total contract price.

(5) If at any time a progress payment or the unliquidated progress payments exceed the amount permitted by this paragraph (a), the Contractor shall pay the amount of such excess to the Government upon demand.

(b) *Liquidation.* Except as provided in the clause entitled "Termination for Convenience of the Government," all progress payments shall be liquidated by deducting from any payment under this contract, other than advance or progress, the amount of unliquidated progress payments, or 85 percent [1] of the gross amount invoiced, whichever is less. Repayment to the Government required by a retroactive price reduction will be made after calculating liquidations and payments on past invoices at the re-

general creditor with whatever the debtor had when the general loan was made. There is a slight potential for harm, however, when a general lender comes to a debtor after the government has made progress payments, because then the lender could be deceived that the value of the government's progress payments would be available to it as collateral. All a general lender would need to do in such a case, however, would be to ask the debtor if it has any government contracts, hardly a great burden.

1. For lower percentages for this paragraph (b) and for (a)(3)(ii) and (a)(4), see § 163.81–2.

duced prices and adjusting the unliquidated progress payments accordingly.

(c) *Reduction or Suspension.* The Contracting Officer may reduce or suspend progress payments, or liquidate them at a rate higher than the percentage stated in (b) above, or both, whenever he finds upon substantial evidence that the Contractor (i) has failed to comply with any material requirement of this contract, (ii) has so failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of this contract, (iii) has allocated inventory to this contract substantially exceeding reasonable requirements, (iv) is delinquent in payment of the costs of performance of this contract in the ordinary course of business, (v) has so failed to make progress that the unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract, or (vi) is realizing less profit than the estimated profit used for establishing a liquidation percentage in paragraph (b), if that liquidation percentage is less than the percentage stated in paragraph (a)(1).

(d) *Title.* Immediately, upon the date of this contract, title to all parts; materials; inventories; work in process; special tooling as defined in the clause of this contract entitled "Special Tooling"; special test equipment and other special tooling to which the Government is to acquire title pursuant to any other provision of this contract; nondurable (*i.e.*, noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids title to which is not obtained as special tooling pursuant to this paragraph; and drawings and technical data (to the extent delivery thereof to the Government is required by other provisions of this contract); theretofore acquired or produced by the Contractor and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by the applicable provisions of this contract such as: the Default clause and paragraph (h) of this clause; Termination for Convenience of the Government clause; and the Special Tooling clause. Current production scrap may be sold by the Contractor without approval of the Contracting Officer and the proceeds shall be credited against the costs of contract performance. With the consent of the Contracting Officer and on terms approved by him, the Contractor may acquire or dispose of property to which title is vested in the Government pursuant to this clause, and in that event, the costs allocable to the property so transferred from this contract shall be eliminated from the costs of the contract performance and the Contractor shall repay to the Government (by cash or credit memorandum) an amount equal to the unliquidated progress payments allocable to the property so transferred. Upon completion of performance of all the obligations of the Contractor under this contract, including liquidation of all progress payments hereunder, title to all property (or the proceeds thereof) which had not been delivered to, and accepted by the Government under this contract or which had not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this clause shall vest in the Contractor. The provisions of this contract referring to or defining liability for Government-furnished property shall not apply to property to which the Government shall have acquired title solely by virtue of the provisions of this clause.

(e) *Risk of Loss.* Except to the extent that the Government shall have otherwise expressly assumed the risk of loss of property, title to which rests in the Government pursuant to this clause, in the event of the loss, theft or destruction of or damage to any such property before its delivery to and

acceptance by the Government, the Contractor shall bear the risk of loss and shall repay the Government an amount equal to the unliquidated progress payments based on costs allocable to such lost, stolen, destroyed or damaged property.

\*     \*     \*     \*     \*     \*

(h) *Special Provisions Regarding Default.* If this contract is terminated pursuant to the clause entitled "Default," (i) the Contractor shall, upon demand, pay to the Government the amount of unliquidated progress payments and (ii) with respect to all property as to which the Government elects not to require delivery under the clause entitled "Default," title shall vest in the Contractor upon full liquidation of progress payments, and the Government shall be liable for no payment except as provided by the "Default" clause.

(i) *Reservations of Rights.* The rights and remedies of the Government provided in this clause shall not be exclusive, and are in addition to any other rights and remedies provided by law or under this contract. No payment, or vesting of title pursuant to this clause, shall excuse the Contractor from performance of his obligations under this contract, nor constitute a waiver of any of the rights and remedies of the parties under this contract. No delay or failure of the Government in exercising any right, power or privilege under this clause shall affect any such right, power or privilege, nor shall any single or partial exercise thereof preclude or impair any further exercise thereof or the exercise of any other right, power or privilege of the Government.

\*     \*     \*     \*     \*     \*

FRIEDMAN, Chief Judge, concurring:

In one respect the court's analysis produces a paradoxical result. The court recognizes that if the government had title to Bond's property and if the plaintiff's lien on that property attached before the government's title vested, the invalidation of the plaintiff's lien by the government's title would constitute a compensable taking by the United States of the plaintiff's security interest. The court holds, however, that although the government purported to "acquire title" to the property, in fact it acquired only a lien to secure the progress payments it made. The court then holds that, as a matter of federal law, the government's security interest prevails over the plaintiff's state-created lien without regard to whether that lien antedated the government's. The result is that the lesser security interest the government has in Bond's property as a result of the court's holding (a lien on, rather than title to, the property), gives the government greater rights in that property (priority for its lien over the plaintiff's possibly prior lien) than it would have had if it had title.

The reason for this result, however, is convincing. The government obtains a lien only to secure its progress payments. Those payments necessarily increase the value of Bond's assets. Accordingly, it is fair and appropriate that the government should be given priority with respect to the additional value its own monetary advances created. That is all the court's decision does.

As a matter of federal procurement law and policy, there is no convincing reason why the plaintiff's floating lien should prevail over the government with respect to property values the government created. By definition the plaintiff could not have looked to those subsequently created values to protect its claim at the time its security interest arose. No unfairness results from protecting the federal interest by thus limiting the reach of the plaintiff's lien.