**FIRST NATIONAL BANK OF FORT WORTH, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 555–83C.

United States Claims Court.

Sept. 27, 1985.

S. Gary Werley, Fort Worth, Tex., atty. of record, for plaintiff. Bishop, Payne, Lamsens and Brown, Fort Worth, Tex., of counsel.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. The question presented is whether plaintiff, First National Bank of Fort Worth (the bank), can recover from the United States the amount of a check drawn on the bank payable to

the Internal Revenue Service (IRS), for which the bank gave its cashier's check in the mistaken belief that the drawer's account contained sufficient funds to cover the check. Plaintiff argues that the United States, as endorser of the check, should be held to have promised that, upon dishonor, it would "pay the instrument according to its tenor at the time of [its] indorsement". U.C.C. § 3–414(1) (1977). Having considered the parties' briefs and having heard oral argument, the court has concluded that plaintiff cannot prevail as a matter of law and that defendant's motion for summary judgment must, therefore, be granted.

## FACTS

The transaction which gave rise to the present controversy occurred on May 27, 1983. On that day two revenue officers of the IRS entered the premises of Eagle Security Services, Inc. to seize the assets of the business pursuant to federal tax liens which had been levied to secure payment of approximately $104,000 in delinquent taxes. The proprietor of Eagle Security, Mr. Al Foster, requested and was granted some extra time to try to raise the money needed to satisfy the tax obligations.

After twice leaving the premises and returning empty-handed, Foster returned from a third excursion with a receipt indicating that $100,000 had been deposited to a checking account at plaintiff bank. Foster then wrote a check in the amount of $100,000, payable to IRS, drawn on Eagle Security Service's account with First National, which he gave to the revenue officers.

Upon receiving the check, the officers abandoned the physical seizure of the premises and immediately proceeded to the main office of First National Bank. One of the revenue officers, Mr. Albert C. Anderson, presented the check at a teller window, identified himself, and inquired whether the bank could convert Eagle's check to a certified check. The teller, after verifying the account balance by computer, requested that Mr. Anderson endorse the check,

which he did. Thereupon, the teller took the Eagle check and issued a cashier's check, payable to IRS, in the amount of $100,000. Mr. Anderson forwarded the cashier's check to the IRS district office in Dallas. That same afternoon he released the federal tax lien that had been recorded against Eagle Security Services.

The bank's cashier's check was paid on June 3, 1983. However, on June 6, 1983, the $100,000 check Foster had deposited to the Eagle account on May 27, 1983 (the deposit recorded on the receipt Foster had given the revenue officers) was returned to First National unpaid because it had been drawn against insufficient funds. Without the funds represented by that check, the Eagle Security account contained only $44.46. Payment of the cashier's check thus resulted in a loss of $99,955.54 to plaintiff. The bank secured a judgment in that amount against Foster, but when that proved uncollectible, initiated this action to recover the funds paid to IRS.

The United States has moved for summary judgment arguing (i) that an endorser's contract is one implied in law and hence beyond the court's Tucker Act jurisdiction, (ii) that the revenue officer who endorsed the check lacked the contracting authority necessary to bind the United States, and (iii) that to the extent the Government could be held obligated on its contract as endorser, it should nevertheless be relieved of liability under the doctrine of equitable estoppel. Plaintiff contests these points and further argues that there remain material factual disputes as to whether Revenue Officer Anderson acted in bad faith and whether the United States suffered any actual detriment in reliance on the issuance of plaintiff's cashier's check. The court concludes that this case is properly within its jurisdiction. The Government is entitled to prevail because, even under a rule which would incorporate the U.C.C. as a basis for decision, its liability as endorser would be extinguished by the bank's issuance of its cashier's check, which constituted final payment of the Eagle Security check.

## DISCUSSION

### A. *Jurisdiction*

■ Defendant has argued that the contract between the endorser of a negotiable instrument and his transferee is one implied in law and hence outside the jurisdiction granted this court under the Tucker Act, 28 U.S.C. § 1491 (1982). In the court's view, characterization of an endorser's contract as implied in law proceeds from a misapprehension of the distinction between contracts which rest upon mutual assent (whether evidenced by words or by conduct) and those which the law implies in the absence of any evidence of mutual assent. *See* 1 A. Corbin, *Corbin on Contracts* § 19 (1963).

The distinguishing feature of an obligation implied in law is the lack of any action of the parties which could be regarded as promissory in nature. As Corbin explains, "neither the words nor the other conduct * * * are promissory in form or justify any inference of a promise." *Id.* § 17, at 38. Contracts implied in law are thus legal fictions; they denote transactions in which an obligation is imposed as a matter of equity and fairness rather than as the enforcement of a duty borne of assent.

.Viewed in this light, the contract evidenced by the endorsement of a check does not fit the definition of a contract implied in law. The act of endorsing a negotiable instrument constitutes conduct from which a promise may justifiably be inferred. Based upon commercial practices of long standing, a transferee of a negotiable instrument is justified in interpreting the objective fact of an endorser's signature as a promise to pay the instrument if it is dishonored, thus offering assurance of its negotiability. W. Hawkland, *Commercial Paper* 21 (1st ed. 1959). The fact that today the content of that promise is formalized in statute, *i.e.,* U.C.C. § 3–414, does not alter or extinguish the accepted understanding of an endorsement as a promissory engagement.

The Government points to *Stewart Sand and Material Co. v. Southeast State Bank,* 318 F.Supp. 870 (W.D.Mo.1970), as standing for the proposition that the promise of the United States as endorser of a negotiable instrument is a promise implied in law. In that case, the court reasoned that because an endorsement is rendered enforceable by a provision of state law (U.C.C. § 3–414) even in cases where the endorser lacks a subjective intent to be bound, an endorsement constitutes a contract implied in law. Because we believe this analysis to be wrong as a matter of law, we decline to follow the result of *Stewart Sand.*

Contrary to the view expressed by the court in that case, enforcement of a promise where one party had no intent to be bound is not the hallmark of a contract implied in law. "The cases demonstrate plainly enough that a person may be held bound in accordance with his expressions as understood by the other party, even though his own intention and meaning were different." 1 A. Corbin, *Corbin on Contracts* § 106, at 475 (1963). As discussed above, custom and practice common to all who deal in commercial paper justify a transferee of a negotiable instrument in interpreting a transferor's endorsement as a promise. Moreover, the promissory nature of the endorsement is not altered by the fact that the duties thereby assumed are not enumerated in a single integrated document.

### B. *Contractual Authority of Revenue Officer*

■ The United States argues that, even if its endorsement is held to constitute an objective manifestation of its agreement to pay the Eagle Security check upon dishonor, and hence a contract within the jurisdiction of the court, the contract is void as against the United States because the revenue officer who endorsed the check lacked authority to bind the Government to contracts in excess of $500. In support of this contention, defendant relies on IRS Delegation Order No. 106 (Rev.5) of March 21,

1982, which delegates to revenue officers procurement authority for seizure-related expenses up to $500.

The precedents of this court make clear that an agent who acts beyond his authority has no power to bind the United States. *See, e.g., Kania v. United States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981); *Grismac Corp. v. United States,* 214 Ct.Cl. 39, 556 F.2d 494 (1977). However, contrary to defendant's assertion, Delegation Order No. 106 does not support the conclusion that Revenue Officers are disabled from binding the United States by their endorsements of negotiable instruments.

The order in question addresses a revenue officer's procurement authority, that is, his authority to obligate funds of the United States for the purchase of goods and services. An officer's authority to buy a padlock or hire a locksmith is wholly irrelevant to the question of whether he is authorized to endorse and negotiate commercial paper in pursuit of his duty to collect the revenue. The nature of the two undertakings is very different: procurement requires that the treasury be opened to pay for value received, whereas endorsement merely guarantees that where the United States receives value in exchange for a worthless instrument, it will restore the status quo by repaying the holder of the paper.

That a reading of Delegation Order No. 106 which limits its applicability to purchasing authority is proper is reinforced by the language of the order placing a $500 ceiling on revenue officers' procurement authority. A rule which would validate an officer's endorsement of an instrument of $500 or less while voiding endorsements of instruments above that amount would be anomalous and would inject unwarranted uncertainty into commercial transactions involving agents of the IRS.

While the court views defendant's reliance on Delegation Order No. 106 as misplaced, the argument suggests a deeper question. We are prompted to inquire whether, as a matter of federal tax policy, the United States ought to be relieved of an endorser's duty to repay where it negotiates taxpayer checks in the course of collecting the revenue. This question, in turn, presents the problem of identifying the source of a rule of decision for this case.

### C. *Liability of United States as Endorser*

Plaintiff argues that the court should follow the lead of *Marine Midland Bank v. United States,* 231 Ct.Cl. 496, 687 F.2d 395 (1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983), which, according to plaintiff, adopted commercial principles derived from the U.C.C. as the federal rule of decision for determining the priority to be accorded certain Government liens. If the court adopts the rule, set out in U.C.C. § 3–414, that an endorser promises to pay the instrument according to its tenor upon dishonor, plaintiff asserts that defendant must be found liable to pay the $99,955.44 loss plaintiff suffered as a result of the overdraft on Eagle Security's account. The Government disputes that *Marine Midland* went so far as to adopt the U.C.C. as the federal rule of decision, but goes on to argue that even under the U.C.C. it would be relieved of liability because the condition precedent to its duty to pay, namely dishonor of the check, never occurred.

As an initial matter, the court agrees with defendant that the Court of Claims in *Marine Midland* did not adopt Article 9 of the U.C.C. as the federal rule of decision for that case. To the contrary, citing a need for uniformity, the court rejected a federal rule that incorporated state law. *Marine Midland,* 231 Ct.Cl. at 511, 687 F.2d at 404. Unfortunately, *Marine Midland* is of little aid in indicating the direction this court should take in fashioning a rule for this case.

There can be no doubt that the law to be applied in this case, involving, as it does, a transaction undertaken by the United States to effect collection of the revenue, is

federal law. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592–93, 93 S.Ct. 2389, 2396–97, 37 L.Ed.2d 187 (1973). However, identifying the law to be applied as federal in source leaves open the question of whether the United States' liability on its endorsement of commercial paper demands a uniform rule enunciated as a matter of federal common law, or whether this is a situation where the federal interest will not be prejudiced by the incorporation of state law as the federal rule of decision. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979).

The court faces a dilemma here, because the choice of law question has not been completely addressed by the parties' briefs. While plaintiff has argued for a rule adopting the U.C.C. as a basis for decision, it has not specified whether the U.C.C. should be incorporated from state law or adopted as federal common law. On the other hand, the Government has responded to plaintiff's U.C.C. argument on the merits without suggesting an alternative rule pursuant to which the United States would be relieved of liability as a matter of federal common law. For this reason, the court is not prepared to select between the two alternatives. This does not prevent our disposition of the case, however, because it is clear that plaintiff could not prevail even were we to adopt the U.C.C. as the rule of decision.

■ Under U.C.C. § 3–414, upon which plaintiff relies, the duty of an endorser of commercial paper to pay the instrument is conditioned upon dishonor of the instrument. On the facts of this case, plaintiff, the bank on which the Eagle Security check was drawn, did not dishonor the check. Rather, by issuing its cashier's check for the Eagle Security check it paid the item. Section 4–213(1)(a) of the U.C.C. provides that an item is finally paid when the drawee pays in cash. The rule that a cash payment is final extends to payment by cash-equivalent, *i.e.*, cashier's check. *See* 7 R. Anderson, *Uniform Commercial Code*

§ 4–213:4, at 87 (3d ed. 1985); Annot., 23 A.L.R. 4th 203, 208 (1983).

The concept of final payment is further refined by U.C.C. § 3–418, which provides:

> Except for recovery of bank payments as provided in the Article on Bank Deposits and Collections (Article 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

Comments 1 and 2 to that section make clear that the policy interests that are served by conferring finality upon payment of an instrument extend to the situation where a drawee pays an overdraft. Comment 1 states that "it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date * * * ". Comment 2 asserts that the same argument applies "to the payment of overdrafts, or any other payment made in error as to the state of the drawer's account." Outside the narrow range of exceptions identified in § 3–418, a final payment cannot be recovered from the payee. *See* U.C.C. § 3–418 comment 1. The policy of finality would obviously be nullified if a payor were permitted to recover payment by enforcing the endorser's contract, particularly where the endorser and the payee are one and the same.

■ On the present facts, the bank's payment of the Eagle Security check by issuing its cashier's check was final, and in ordinary circumstances could not be recovered from the United States as payee. Plaintiff nevertheless attempts to avoid this result by asserting that the Government breached its warranty on presentment, as defined in U.C.C. § 3–417. This contention is without merit.

Plaintiff's breach of warranty argument is based upon the contention that the United States, in violation of U.C.C. § 3–417(2)(e), knew and failed to disclose that insolvency proceedings had been instituted

against Foster, the drawer of the Eagle Security check. Plaintiff characterizes the Government's filing of its tax lien and seizure of the Eagle Security office as the institution of insolvency proceedings. The U.C.C. defines insolvency proceedings as "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." U.C.C. § 1–201(22). The court does not view the enforcement of a lien levied by a single creditor as the commencement of an insolvency proceeding within the U.C.C. definition. Therefore, there is no basis for concluding that an exception to the final payment rule applies in this case.

Although neither party has argued that a federal common law rule would yield a different result, the court would point out that such a federal rule would certainly be no more generous to plaintiff's rights. Indeed, a persuasive argument could be made that a federal rule of decision would require that a bank in plaintiff's position be absolutely foreclosed from enforcing the contract of the United States as endorser of commercial paper.

This result is suggested by 26 U.S.C. § 6311(b)(2), which provides, "[i]f any certified, treasurer's, or cashier's check * * * so received [in payment of federal taxes] is not duly paid, the United States shall * * * have a lien for the amount of such check (or draft) upon all the assets of the financial institution on which drawn * * * *". 26 U.S.C. § 6311(b)(2) (1982), *as amended by* The Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 448(a), 98 Stat. 494, 817–18 (1984). This statute, while directed to the situation where the taxpayer, rather than IRS, procures issuance of a certified or cashier's check, indicates a Congressional policy favoring collection of the revenue over the rights of issuing banks to stop payment, for example. Under § 6311, the United States is given the option to proceed against either the bank or the taxpayer in the event a cashier's or certified check is dishonored. On the other hand, the bank, if it has a remedy at all, must proceed against the taxpayer. By analogy, where the United States has received payment by endorsing a taxpayer's check, it would follow that the payor of an overdraft would be limited to proceeding against the taxpayer who drew the check.

## FACTUAL QUESTIONS

Plaintiff has argued that there is a material factual dispute as to whether the revenue officer who presented the Eagle Security check knew, or had reason to know, that the account on which the check was drawn did not contain sufficient funds to cover the item and thus acted in bad faith. If he did act in bad faith, plaintiff argues that the case would come within the rule of *Kirkendall v. United States*, 90 Ct.Cl. 606, 31 F.Supp. 766 (1940). In that case, the court enforced an implied contract to make restitution which it said arose from the illegal seizure of funds from an innocent party to satisfy the tax liability of another. The *Kirkendall* case was limited, in *Collins v. United States*, 209 Ct.Cl. 413, 532 F.2d 1344 (1976), to "cases in which the actions of the agents of the Government are so egregious as to constitute a fraud on the rights of the individual." *Id.* at 422, 532 F.2d at 1350.

Having studied the deposition of the revenue officer, Mr. Anderson, which is part of the record in this case, the court is convinced that no factual dispute exists and that Mr. Anderson did not act in bad faith. Mr. Anderson testified that when Foster gave him the deposit receipt, he (Anderson) had no doubt there were funds on deposit to cover the Eagle Security check.

Plaintiff has not produced any counter-affidavit to contradict or impeach this testimony. Therefore, plaintiff has completely failed to demonstrate that the actions of Mr. Anderson were so egregious as to constitute a fraud on its rights.

Plaintiff additionally contests the Government's invocation of equitable estoppel, arguing that there is no evidence in the record to suggest that the United States actually suffered any detriment by releasing its tax lien. Because resolution

of the issue of equitable estoppel is not necessary to the result we reach, any factual dispute as to that issue is immaterial.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted. The complaint shall be dismissed.