**McDONNELL DOUGLAS CORPORATION,**
Respondent,

v.

**DIRECTOR OF REVENUE, Appellant.**

No. 79258.

Supreme Court of Missouri,
En Banc.

May 27, 1997.

438

Jeremiah W. (Jay) Nixon, Attorney General, John R. Munich, Deputy Chief County for Litigation, James R. McAdams, Tina M. Crow Halcomb, Assistant Attorneys General, Jefferson City, for Appellant.

Carol Lewis Iles, John Barrie, St. Louis, for Respondent.

LIMBAUGH, Judge.

In this case, we determine whether respondent, McDonnell Douglas Corporation, is entitled to a refund for use taxes it paid on tangible personal property purchased to fulfill its contracts with the United States Government. The Administrative Hearing Commission (AHC) concluded that respondent

was entitled to the refund for the claim period at issue. The Director of Revenue filed a petition for review in this Court. We have jurisdiction because this case involves construction of the revenue laws of this state. Mo. Const. art. V, sec. 3. We now affirm the decision of the AHC.

On August 22, 1994, McDonnell Douglas Corp. (MDC), an aerospace manufacturing company with its corporate headquarters in St. Louis, Missouri, filed a complaint challenging the Director of Revenue's (the Director) denial of a refund claim for use tax paid for the period of July 1990 through September 1993. During this time period, MDC entered into contracts with the United States Government (the government) for the manufacture of military aircraft and missiles. In the performance of these contracts, MDC purchased overhead materials and supplies for which it paid use tax to Missouri. In presenting its request for a refund to the Director, MDC claimed that the purchases were exempt from use tax because they were purchases for resale under sec. 144.615(6), RSMo 1986.[1] After the Director denied the request, the AHC determined that MDC's transfer of overhead property to the government qualified for the resale exemption. The Director now challenges this determination. We review the decision of the AHC to determine if it is "authorized by law and supported by competent and substantial evidence upon the whole record." Sec. 621.193, RSMo 1994.

At the hearing before the AHC, MDC presented evidence that the government entered into two types of contracts with MDC during the claim period. One is a fixed price contract under which the government negotiates a fixed price for the product to be manufactured by MDC. When using this type of contract, the government agrees to make progress payments during the course of contract performance to MDC, and these payments are then offset against the fixed sum that is due under the contract. The other type of contract is a cost reimbursable contract under which the government agrees to reimburse MDC for the costs it incurs in performing the contract. Both types of contracts incorporate certain provisions of the Federal Acquisition Regulations (FAR), and in particular, either FAR 52.232–16, 52.245–2, 52.245–5, or language that is identical in all material respects to these regulations. The FAR regulations provide that title to property purchased by a contractor, such as MDC, shall vest in the government.[2]

In general, the Missouri Compensating Use Tax Law, secs. 144.600 to 144.761, is designed to tax out-of-state purchases of tangible personal property by Missouri residents who use the property within the state. *See* II Mo. *Taxation Law and Practice*, sec. 9.45 (Mo. Bar 3d ed.1996). Under sec. 144.610 a use tax "is imposed for the privilege of *storing, using or consuming within* this state any article of tangible personal property purchased" from a vendor. Section 144.615 provides a resale exemption to the levy of the use tax. This exemption applies to "[t]angible personal property held by processors, retailers, importers, manufacturers, wholesalers, or jobbers solely for resale in the regular course of business." Sec. 144.615(6).

■ The term "resale" as it is used in sec. 144.615(6) is accorded the same meaning as

---

1. All statutory references are to RSMo 1986 unless otherwise indicated.

2. FAR 52.232–16 applies to contracts involving progress payments and provides in part:
    (d) Title. (1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.
FAR 52.245–5 applies to cost-reimbursement contracts and provides in part:

    (c) Title.... (3) Title to all other property, the cost of which is reimbursable to the Contractor, shall pass to and vest in the Government upon -
    (i) Issuance of the property for use in contract performance;
    (ii) Commencement of processing of the property for use in contract performance; or
    (iii) Reimbursement of the cost of the property by the Government, whichever occurs first.
FAR 52.245–2 applies to fixed-price contracts and is identical to FAR 52.245–5 with regard to the vesting of title.

the term "sale" in the Missouri Compensatory Use Tax Law. *Smith Beverage Co. of Columbia v. Reiss*, 568 S.W.2d 61, 64 (Mo. banc 1978). Sale, and accordingly resale, is defined as "any transfer, barter or exchange of the title or ownership of tangible personal property, or the right to use, store or consume the same, for a consideration paid or to be paid...." Sec. 144.605(7), RSMo Supp. 1992. Thus, the elements of the resale exemption are: (1) a transfer, barter or exchange, (2) of the title or ownership of tangible personal property or the right to use, store or consume the same, (3) for a consideration paid or to be paid. *Aladdin's Castle, Inc. v. Director of Revenue*, 916 S.W.2d 196, 198 (Mo. banc 1996).

■ MDC takes the position that it transferred title and ownership of the property in question for consideration to the government by virtue of the title vesting provisions and contract payments included in the federal defense contracts. The Director disagrees for several reasons. First, she contends that even if MDC transferred title to the overhead materials, it did not transfer its ownership interest and thus it is still liable for use tax on the ownership interest. Under the use tax statutory scheme, however, a resale is any transfer of the "title *or* ownership of tangible personal property." *See* sec. 144.605(7) (emphasis added); *Smith Beverage*, 568 S.W.2d at 64. The statutory language necessarily means that a resale of personal property takes place if either of the taxable interests in the property is transferred to the end purchaser. *Cf. State ex rel. Thompson–Stearns–Roger v. Schaffner*, 489 S.W.2d 207, 215 (Mo.1973) (holding that a sales transaction takes place if either title or ownership is transferred). Thus, even if MDC retained an ownership interest in the overhead materials after a resale to the federal government took place, MDC is still entitled to the resale exemption if they did in fact transfer title to the property.

■ The Director also asserts that MDC could not have resold the overhead supplies and materials because it used or consumed them in the performance of its contractual obligations. On this point, the Director relies on *City of St. Louis v. Smith*, 342 Mo.

317, 114 S.W.2d 1017 (1937), and *Overland Steel, Inc. v. Director of Revenue*, 647 S.W.2d 535 (Mo. banc 1983), in which this Court held that "materials purchased by a contractor for use in meeting contractual obligations for the improvement of real property are used or consumed by the contractor; they are not resold." *Overland Steel*, 647 S.W.2d at 538 (*citing City of St. Louis v. Smith*, 342 Mo. 317, 114 S.W.2d 1017 (1937)). The key difference between *Smith* and *Overland Steel* and the case at hand is that in the former cases, the contracts did not contain any title vesting provisions, and the only contractual obligation was to construct the end product. In contrast, the contracts at issue in this case specifically provide for the vesting of title in the government of the property purchased by MDC for the performance of the contracts *before* the property was used or consumed. On the facts of the present case, the Director's point has no merit.

■ The Director next argues that the title vesting provisions in the contract do not actually transfer title to the government. In support, the Director cites *Marine Midland Bank v. U.S.*, 231 Ct.Cl. 496, 687 F.2d 395 (1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983), for the proposition that the federal title vesting provisions transfer only a security interest in the property at issue. In *Marine Midland*, the Court of Claims determined that the title vesting provision in the federal contracts at issue in that case was intended to secure the progress payments made under the contracts, and thus that the interest transferred under this provision was more analogous to a lien than actual title. *Id.* at 401. The court noted that a literal interpretation of title vesting clauses was required until 1958, because before that time the government was prohibited by statute from advancing public money. *Id.* at 400–01. "The government's title vesting program was developed as the answer, conditioning progress payments on the vesting of title, on the theory that there was no 'advance' of public money if the government took something of value for its payments." *Id.* at 401. In 1958, however, Congress relaxed the public money advancement prohibition by allowing progress payments to

federal contractors; thus, as the *Marine Midland* court reasoned, a literal interpretation of the title vesting clauses was no longer necessary. *Id.*

*Marine Midland's* interpretation of the federal title vesting provisions was rejected by the Seventh Circuit in *In re American Pouch Foods, Inc.*, 769 F.2d 1190 (7th Cir. 1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986). In holding that the title vesting clauses transfer full title to the federal government, *id.* at 1193, the Seventh Circuit emphasized that except for *Marine Midland*, all the federal cases both before and after 1958 determined that these clauses are to be taken literally, *id.* at 1196. *See also* Brett W. King, *Federal Acquisition Law in an Era of Declining Defense Spending: Defining the Government's Interest in Defense Contractor Property*, 42 NAVAL L. REV. 35, 42–45 (1995). Because the security interest theory of *Marine Midland* has yet to be adopted as a majority view by the federal courts, there is no compulsion at this time to ignore the plain meaning of the title vesting provisions included in the federal contracts at issue in this case.

■ Next, the Director contends that MDC never took title to the overhead property that is purchased in the performance of the contract and, thus, cannot have subsequently transferred title to the government. To be sure, there is no evidence of any express agreement between MDC and its vendors for the passage of title to the property purchased by MDC. The evidence at the hearing, however, established that MDC, not the government, purchased the items of overhead property and, further, that the property was then delivered to a shipping dock at MDC. Under Missouri law, title passes from a seller to a buyer upon completion of delivery by the seller unless the parties to the transaction intend otherwise. *Kurtz Concrete, Inc. v. Spradling*, 560 S.W.2d 858, 861 (Mo. banc 1978). Accordingly, in the absence of evidence that the parties intended otherwise, MDC received title to the property upon its delivery to the shipping docks. Under the title vesting provisions, title was then transferred to the government when the property was allocable or properly charge-

able to a contract; or upon issuance of the property for use in contract performance; or upon commencement of processing of the material; or upon reimbursement of the cost of the material by the government. *See* FAR 52.232–16, 52.245–2 & 52.245–5. Based on the foregoing, there is sufficient evidence to conclude that MDC took title originally from its vendors before retransferring title to the government.

■ The Director also argues that a valid resale did not take place because there was no consideration for the transfer. Consideration is present if MDC establishes a quantitative connection between the overhead materials and supplies and the payments made by the government under the defense contracts. *See Aladdin's Castle*, 916 S.W.2d at 198. We agree with MDC that the evidence adduced at the hearing showed that the cost of the overhead materials and supplies was included in the contract amounts paid by the government. The AHC found specifically that during the negotiations for both the fixed price contracts and the cost reimbursable contracts, MDC discloses in detail to the government the anticipated direct and indirect costs for a particular contract. For a fixed price contract, the government pays the fixed price in progress payments, with each payment amount based on actual costs. For a cost reimbursable contract, the government pays the actual costs incurred by MDC in performing the contract. We conclude that under these circumstances there is a quantitative connection between the transfer of overhead property to the government and the payments made by the government under the defense contracts. The consideration element of resale is met in this case.

■ Finally, the Director submits that the transaction with the government cannot qualify as a resale because the transfer of title is both incomplete and temporary. The transfer of title is incomplete, the Director explains, because under MDC's cost allocation system only undivided portions of title to the overhead property are actually allocated to the performance of a federal contract, while other undivided portions are allocated to non-federal contracts. Even if this characterization is correct, the Director provides

no support, and we have found none, for the bald assertion that the resale exemption does not apply to transfers of undivided interests in property. Alternatively, the Director suggests that the transfer of title does not qualify as a resale because, at the completion of contracts incorporating FAR 52.232–16, title revests in MDC for all property not delivered to, and accepted by, the government or incorporated in supplies delivered to, and accepted by, the government. The fact that, under certain of the federal defense contracts, title to overhead property not consumed or incorporated into the end product vests in MDC does not defeat the conclusion that an earlier resale of overhead property to the government took place.

In conclusion, MDC's purchases of overhead property for performance in its federal contracts qualify for the resale exemption; thus, MDC is entitled to a refund for use taxes it paid on these purchases during the claim period.

HOLSTEIN, C.J., PRICE, ROBERTSON and COVINGTON, JJ., and DIAL and PARRISH, Special Judges, concur.

BENTON and WHITE, JJ., not sitting.