FAIRCHILD, Senior Circuit Judge.
In a reorganization proceeding under Chapter 11 of the Bankruptcy Code the district court decided, in response to a complaint by the United States, that the United States held absolute title (and right to possession) to certain goods in the possession of the Debtor, American Pouch Foods, Inc. (Pouch). The court abstained from hearing Pouch’s counterclaim. In Re American Pouch Foods, Inc., 30 B.R. 1015 (D.C.N.D.Ill.1983). Pouch appeals. We affirm.
In January 1979, Pouch entered into a procurement contract with the United States Defense Logistics Agency (Government). The contract called for Pouch to produce combat rations, known as “Meals, Ready to Eat” (Food Pouches), for use by *1192 branches of the Armed Services. The contract gave Pouch the right to progress payments upon request, not more often than bi-weekly. The payments were limited to 90% of Pouch’s cost incurred to the date of payment. The so-called title vesting clause of the progress payment part of the contract provided that title to all parts, materials, inventories, work in ‘process and various other categories immediately vested in the Government.[1] Other provisions gave the Government the right to terminate for default (or for convenience of the Government) and to require delivery to it of completed supplies and manufacturing materials. The contract also provided that if, after notice of termination for default, it was determined that Pouch was not in default or that default was excusable, the rights and obligations of the parties would be the same as if the notice of termination had been for convenience of the Government.
After making approximately $13 million in progress payments the Government terminated the contract for default. The Government claimed that Pouch had not complied with required production schedules. On November 10, 1980, three days after the contract was terminated, Pouch filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. The Government claimed ownership and possession of all the property allocable to the contract in Pouch’s possession or stored at warehouse facilities on its behalf. On December 5, 1980 the Government filed an adversary complaint in bankruptcy court to obtain possession.
Pouch filed an answer principally alleging wrongful termination of the contract and that the Government’s title was a security interest not perfected as required by law and subordinate to the rights of the debtor and creditors. Pouch filed a counterclaim seeking damages arising from wrongful termination of the contract.
On February 9, 1981, the bankruptcy court held that, as a matter of law, the Government had absolute title to the property in question and was entitled to repossess it.
While the appeals were pending the bankruptcy court held that it had jurisdiction to hear Pouch’s counterclaim even though the Armed Services Board of Contract Appeals had concurrent jurisdiction over the claim.
After the district court decided that questions of fact must be determined and remanded to the bankruptcy court, the Government filed a motion for reconsideration. In 1983, before that motion was decided, Pouch filed a motion in the district court to withdraw from the bankruptcy court the reference of the Government’s adversary proceeding. That motion was granted.
Upon reconsideration the district court held that, as a matter of law, the Government had absolute title to all of the property covered by the title vesting clause. In Re American Pouch Foods, Inc., 30 B.R. at 1023. The court also noted that if the Government only took a lien on the alloca-ble property, to secure its progress payments, the lien would be paramount to any other liens. Id. The court decided to abstain from hearing Pouch’s counterclaim because the issue was better brought be *1193 fore the Armed Services Board of Contract Appeals. Id. at 1024.
I
Pouch is a debtor in possession in a reorganization proceeding and as such claims, under 11 U.S.C. § 544(a)(1), the rights and powers of a creditor with a judicial lien. Pouch argues that the title vesting clause in the contract only gave the Government a security interest (lien) in the contract property and that Pouch’s hypothetical lien has priority because the Government’s lien was not perfected in compliance with the Illinois Commercial Code.
Pouch relies on United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). There the Supreme Court was confronted with the issue of “whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities.” 440 U.S. at 718, 99 S.Ct. at 1453 (footnote omitted). The loan programs involved were those of the Small Business Administration and Farmers Home Administration. The Court found it clear that priority of liens stemming from federal lending programs must be determined with reference to federal law. 440 U.S. at 726, 99 S.Ct. at 1457. After analysis of the character and purposes of the lending programs, the Court found it prudent in determining priority “to adopt the ready made body of state law as the federal rule of decision until Congress strikes a different accommodation.” 440 U.S. at 740, 99 S.Ct. at 1464 (footnote omitted).
Pouch first contends that the title vesting clause in the Pouch contract creates only a security interest in the Government such as was clearly the case in Kimbell Foods and secondly that the principles applied in Kimbell Foods require application of the Illinois Commercial Code to determine priority here. It would follow that Pouch’s statutory lien as debtor in possession would be superior to the lien of the Government.
We first consider whether the Government has title such that there is no question of priority of liens. The clear and precise language of the contract between Pouch and the Government granted the Government title. Pouch argues that, notwithstanding the language of the contract, given the intent of the parties, the many incidents and risks of ownership retained by Pouch under the contract, and modern theory in the law of secured transactions, the title vesting clause should not be interpreted literally as grant of title to the Government.
We acknowledge, generally, that contract language which purports to place title to goods in a party not in possession of them may well create only a security interest in that party. See, e.g., Commercial Code provisions, Ill.Rev.Stat. ch. 26, §§ 1-201(37) (Supp.1985), 9-102 and 9-202 (1974). The terms of this contract left Pouch with many of the incidents and risks of ownership.
Thus there would be considerable reason to treat provisions like these, if found in a private contract, as creating a security interest. On the other hand, this is a contract for the procurement of materials for national defense, with its terms spelled out in the regulations of the Defense Department, 32 C.F.R. § 163.79, and a history suggesting a substantial reason for very literal interpretation of the title vesting language.
Since 1823 there has been a federal statute prohibiting advances of public money and payment on contracts in excess of the value of service rendered or goods delivered previously to payment. 3 Stat. 723, Rev.Stat. § 3648 (1873), 31 U.S.C. § 529 (1981), 31 U.S.C. § 3324 (1983). Apparently there grew up a concept of purchase of unfinished goods in return for progress payments (often, in earlier years, referred to as “partial payments”), and doctrine that this statute is not violated by payment previous to delivery if title to the portion paid for has vested in the Government at the time of payment, or if the articles are then *1194 impressed with a valid lien in favor of the Government.
Although the practice has been severely criticized, e.g., McClelland, The Illegality of Progress Payments as a Means of Financing Government Contractors, 33 Notre Dame Law. 380 (1958), the theory had been supported by a 1941 ruling of the Comptroller General, 20 Comp.Gen. 917, 918 (1941), quoted in McClelland, op. cit. p. 389, and by opinions of the Attorney General, cited in Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham Law Rev. 224, 232 (1957).
In 1911 a statute expressly authorized the Navy to make progress payments (referred to as partial payments) in return for a lien, paramount to all other liens. 37 Stat. 32, 10 U.S.C. § 7521.
The First War Powers Act, 55 Stat. 839, § 201, December 8, 1941, authorized advance and progress payments on war effort contracts.
Statutory authority for advance payments (but not progress payments) was conferred by § 5 of the Armed Services Procurement Act of 1947, 62 Stat. 21, February 19, 1948. Section 5(b) required adequate security and provided that the contract may include a lien, paramount to all other liens.[2]
In 1952 Defense Contract Financing Regulations were issued. 32 C.F.R. Part 82,17 Fed.Reg. 3581, April 23, 1952. There were references to progress payments as one method of financing, along with advance payments and guaranteed loans. An earlier form of regulations required the vesting of title when progress (partial) payments were made. City of Detroit v. Murray Corp., 355 U.S. 489, 517-18 n. 4, 78 S.Ct. 458, 465-66 n. 4, 2 L.Ed.2d 441 (1958) (Whittaker, J., dissenting).
On December 17, 1956, revised Defense Contract Financing Regulations were issued. 32 C.F.R. Part 82, 22 Fed.Reg. 815, February 9, 1957. Subpart E, devoted to Progress Payments Based on Costs, required a title clause virtually the same as now required for Small Business concerns by 32 C.F.R. § 163.79 and appearing in the Pouch contract under consideration.
The provision for advance payments was codified as 10 U.S.C. § 2307 by 70A Stat. 1, P.L. 84-1028. As codified, § 2307(a) authorized advance payments and § 2307(c) required adequate security, which may be a lien paramount to any other liens.
Section 2307 was amended in August, 1958, adding express authority to make progress payments, and then, as now, § 2307(a)(1) reads:
(a) The head of any agency may—
(1) make advance, partial, progress, or other payments under contracts for property or services made by the agency; ....
P.L. 85-800 § 9, 72 Stat. 967, August 28, 1958. No reference to progress payments was inserted into (c) so that literally the provision requiring security and making the Government lien paramount applies only to advance payments.
The legislative history reported in [1958] U.S.Code Cong. & Ad.News 4021 deals with other consideration's, with one exception. It contains a letter from the Comptroller General to the Chairman of the Senate Committee on Government Operations. Among a number of comments, the letter says:
We believe that the authority to make “progress” payments should not be provided, unless provision is also made to preserve to the Government the right to take title to or receive a lien paramount to all other liens on the property on which it makes a progress payment.
Although Congress inserted no language in response to the suggestion, we can think of no reason why Congress could have intended less protection for the Government when making progress payments than when making advance payments. If the omission of progress pay *1195 ments from § 2307(c) were inadvertent and if the title clause creates only a lien, it would follow that such lien was intended to be paramount. But the 1958 amendment was énacted when the practice of contracting for progress payments in return for title had been followed for many years. Regulations spelling out the practice and the terms of the title clause had been in effect for eighteen months.[3] We conclude that Congress recognized the practice of making progress payments in return for title and in expressly authorizing progress payments intended to validate the practice. Cf. City of Detroit v. Murray Corp., 355 U.S. at 517-18 n. 4, 78 S.Ct. at 465-66 n. 4 (Whittaker, J., dissenting).
Strong support for literal interpretation of the title clause as vesting ownership in the Government is found in United States v. Ansonia Brass & Co., 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910). The decision may not be conclusive, for the property there involved was a dredge, far more identifiable at any stage before completion than the materials and pouches involved here, and the contracts are not identical. The Supreme Court there said, however,
It is undoubtedly true that the mere facts that the vessel is to be paid for in installments as the work progresses, and to be built under the superintendence of a government inspector, who had power to reject or approve the materials, will not of themselves work the transfer of the title of a vessel to be constructed, in advance of its completion. But it is equally well settled that if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title.
218 U.S. at 466-67, 31 S.Ct. at 52-53 (citation omitted).
There are a number of other decisions recognizing, or at least consistent with, Government ownership of goods in the possession of others, by virtue of the title vesting clause. City of Detroit v. Murray Corp., 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (the majority upheld a local tax on use or possession of property, assuming the property was owned' by the Government; the minority concluded that the Government owned the property by virtue of the title vesting clause and considered the tax invalid, 355 U.S. at 514-24, 78 S.Ct. at 463-69); U.S. v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); United States v. Digital Products Corp., 624 F.2d 690 (5th Cir.1980); In re Double H Products Corporation, 462 F.2d 52 (3rd Cir.1972); Boeing Company v. United States, 338 F.2d 342, 168 Ct.Cl. 109 (1964); Shepard Engineering Company v. United States, 287 F.2d 737, 741 (8th Cir.), reh’g denied 289 F.2d 681 (8th Cir.1961) (per curiam); In re American Boiler Works, 220 F.2d 319 (3rd Cir.1955); In re Read-York, 152 F.2d 313 (7th Cir.1945); United States v. Buder, 414 F.Supp. 1 (E.D.Mo.1975), aff'd without opinion, 538 F.2d 333 (8th Cir.1976); United States v. Ameco Electronic Corporation, 224 F.Supp. 783 (E.D.N.Y.1963); In re Pamlico Canvas Products, Inc., No. 82-01464-4 (Bankr., E.D.N.C., May 19, 1983); In re Invader Corporation, United States v. Invader Corporation, No. 1-81-00338E (Bankr.W.D.Tex., Jan. 12, 1983); United States v. Metadine Corporation, No. C080 0460 (E.D.N.Y., Apr. 17, 1980).
In In re Murdock Mach. & Eng. Co. of Utah, 620 F.2d 767 (10th Cir.1980), the court appeared to acknowledge that the title clause made the Government a good faith purchaser for value of goods purchased by the contractor. The seller of the goods, however, had learned of the insolvency of the contractor and had stopped the goods in transit to the contractor. The court applied the U.C.C., according to the seller the right to stop in transit, superior to the Government’s right as good faith *1196 purchaser. The decision is consistent with recognition of the Government’s title in our present case, unaffected by the debtor’s statutory lien.
In Marine Midland Bank v. United States, 687 F.2d 395, 231 Ct.Cl. 496 (1982), the court read the title vesting clause as creating security for repayment (out of amounts due the contractor at final performance) of the progress payments, which the court deemed loans, rather than partial purchases. Having decided that the Government had only a security interest (as Pouch contends here) the court declined to apply the state U.C.C. as the federal rule of decision governing priority. Emphasizing the need for standardization and uniformity in Government procurement, as distinguished from the federal loan programs which were the subject of Kimbell Foods, supra, the court chose a rule that “the government’s security interest under its title vesting procedures [is] paramount to the liens of general creditors.” Id. 687 F.2d at 404. We would agree with the latter holding if the Government’s interest were only a lien.
We acknowledge the reasonableness of the Marine Midland view if we were considering the title vesting provisions on a clean slate. We do not agree, however, that because the 1958 enactment of express authority to make progress payments removed the original motive for using a title vesting clause, the construction of the clause should change at the time of that enactment. See 687 F.2d at 401. Notwithstanding Judge Bennett’s meticulous explication, we see no reason for departure from the consistent holdings before and after 1958 that the title vesting clause is to be taken literally.
We note, however, that application of the Marine Midland rule to the present case would produce the same result we reach, awarding possession to the Government. Pouch does not argue, nor does the record suggest, that the value of the goods exceeds the total of progress payments. Cf. 687 F.2d at 405.
In United States v. Lennox Metal Manufacturing Co., 225 F.2d 302 (2nd Cir.1955) the court considered a contract providing for progress payments (there called partial payments) and containing a title vesting clause. The Government terminated the contract for default and sued the contractor to recover possession of the property and damages. The district court had found with adequate support that the contractor was not in default, and that foreclosed recovery of damages. The district court also denied recovery of possession.
Judge Frank wrote the opinion, stating his individual view in Part I. Part II, 225 F.2d beginning at 317, was agreed to by all three judges. The Government contended that upon failure to prove default by the contractor, it had nevertheless brought about a termination for convenience. The contract so provided. The court affirmed the denial of possession, holding in Part II that the Government’s refusal to make larger progress payments had been inequitable and such conduct had disentitled it to equitable relief, i.e., “the enforcement of an equitable lien on the [contractor’s] property.” 225 F.2d at 317. Evidently, although without explanation, the court interpreted the title vesting clause as creating only an equitable lien.
We do not agree. Our interpretation of the contract is that upon termination, whether for default or convenience, the Government becomes entitled to possession of the property to which it has title. The ultimate rights to pecuniary adjustment between the parties will depend upon the type of termination, but the Government is entitled to possession under either type. The Fifth Circuit has held that:
[I]n cases involving termination of Government contracts, where the product is part of the national defense effort, the jurisdiction of the district courts does not embrace any issue beyond that of title, so long as the Government represents in its complaint that the contract had been terminated. To hold otherwise would permit a contractor to plead and litigate factual issues surrounding the *1197 termination, and delay delivery of vitally-needed defense products.
United States v. Digital Products Corp., 624 F.2d 690, 692 (5th Cir.1980); accord In Re Greenstreet, Inc., 209 F.2d 660, 667 (7th Cir.1954).
Lennox has not been followed, and has been criticized.[4] Even if a court would apply equitable principles against the Government in a case where extreme unfairness were shown, circumstances of that type have not been suggested here.
II
Pouch filed a counterclaim seeking money damages, alleging that the termination was without just cause, and thus was for the convenience of the Government. The Government asserts sovereign immunity. We need not reach the issue of immunity.
The district court decided to abstain from hearing the counterclaim, concluding that because the Armed Services Board of Contract Appeals and the Court of Claims have expertise in the specialized area of law involved, it would be in the interest of justice for the district court to abstain.
Pouch does not seek review of the abstention decision on its merits, but contends that a particular statute deprived the district court of power to decide to abstain.
Pouch relies upon 28 U.S.C. § 1471(d) created by P.L. 95-598 § 241(a), November 6, 1978, 92 Stat. 2668, made applicable to former courts of bankruptcy during the transition period by § 405(b). Section 405(b) was repealed by P.L. 98-353, § 114, 98 Stat. 343, July 10, 1984. Section 113 deprived § 241(a) of all other effect.
Section 1471(d) provided:
Subsection (b) or (c) of this section does not prevent a district court or a bankruptcy court, in the interest of justice, from abstaining from hearing a particular proceeding arising under title 11. Such abstention, or a decision not to abstain, is not reviewable by appeal or otherwise.
Pouch does not argue that its counterclaim was not “a particular proceeding” subject to possible abstention. Rather, Pouch relies on the June 5, 1981 decision of a bankruptcy judge denying the Government’s motion to dismiss the counterclaim for lack of jurisdiction and requiring the Government to answer. Pouch interprets this order as a decision not to abstain, and reasons that the district court decision to abstain, June 20, 1983, was a forbidden review of the June 5, 1981 decision of the bankruptcy judge.
The February 1981 decision of the bankruptcy judge that the Government was entitled to possession came before the district court on appeal. It is not clear whether there was also an appeal from the June 1981 decision of the bankruptcy judge, but as the law then stood, only an appeal could have brought it before the district court. In the posture of appeal, Pouch might well be correct in its contention that the district court could not review the June 1981 decision insofar as it was a decision not to abstain. Other very significant developments intervened.
The first was the 1982 Supreme Court decision that the broad grant of jurisdiction in § 1471 was unconstitutional. Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982). The Court stayed its judgment until October 4, 1982, in order to give Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication. The stay was extended until December 24, 1982. 459 U.S. 813, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982).
In these circumstances, the Judicial Councils of the Circuits directed the district courts to adopt rules to govern bankruptcy cases.
*1198 The Emergency Rule adopted by the District Court for the Northern District of Illinois, effective December 25, 1982, provided for the automatic referral of all cases arising under Title 11 and all civil proceedings arising in or related to Title 11 to the bankruptcy judges. (Emergency Rule Section (c)(1).) The Rule also stated that:
[t]he reference to a bankruptcy judge may be withdrawn by the district court at any time on its motion or on timely motion by a party.... If a reference is withdrawn the district court may retain the entire matter, may refer part of the matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge.
Rule (c)(2).
In early 1983 the district court had before it the Government’s motion to reconsider the decision on appeal from the February 1981 decision of the bankruptcy judge. Pouch, however, moved to have the reference to the bankruptcy judge withdrawn. The motion was granted February 17, 1983.
The Government argues that the withdrawal of the reference was a recapture by the district court of original jurisdiction and that further proceedings in district court were de novo and not on appeal.
This court has stated that:
The Interim Rule adopted by the district courts establishes a system of bankruptcy adjudication whereby the bankruptcy judges act as adjuncts of the Article III district courts. The district courts retain primary jurisdiction over bankruptcy matters while the bankruptcy judges have only derivative and terminable jurisdiction. The bankruptcy judges act as subsidiaries to and only in aid of the district courts by carrying on preliminary procedures and proposing decisions for adoption by the district court. The ultimate adjudicatory determination is reserved to the district judge.
In Re Mark Stewart, 741 F.2d 127,131 (7th Cir.1984) (emphasis added and citations omitted). We think that in these circumstances reconsideration by the district court did not constitute review of the earlier decision on abstaining. The situation was the same as if the district court had itself made the earlier decision. See United States v. Birney, 686 F.2d 102, 107 (2nd Cir.1982) (judges of coordinate jurisdiction are not bound by other judges’ rulings on the same facts; they are free to disregard the decisions if sufficient notice and an opportunity to prepare are' given to concerned parties); Champaign-Urbana News, Etc. v. J.L. Cummins, 632 F.2d 680, 683 (7th Cir.1980) (as modified on denial of rehearing and rehearing en banc) (a second judge, upon the first judge obtaining senior status, is not precluded by the “law of the case” doctrine from coming to a different conclusion from that of the first judge on the same facts).
Pouch apparently reasons that § 1471(d) prohibits us from reviewing the merits of the district court’s decision to abstain, but that we could properly vacate that decision if § 1471(d) prohibited the district court from making it. Assuming we have that power we conclude that the district court was free to reconsider the matter of abstention without engaging in forbidden review.
We have already noted that on July 10, 1984, § 1471(d) ceased to have any effect. At that date this appeal had been taken, but was not yet argued. On July 10, 1984 § 101(a) of P.L. 98-353 added subsection (c) to 28 U.S.C. § 1334. Subsections (c)(1) and (2) contain provisions similar to § 1471 with respect to abstention. The prohibition of review is in (c)(2). Section 122(b) of P.L. 98-353, however, provides that (c)(2) shall not apply with respect to cases pending on July 10, 1984.
Assuming that we presently have jurisdiction to review the district court decision to abstain, we find no abuse of direction.
The judgment appealed from is Affirmed.

. The title vesting clause in the contract provided, in pertinent part:
(d) Title. Immediately, upon the date of this contract, title to all parts; materials; inventories; work in progress; ... theretofore acquired or produced by the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by applicable provisions of this contract such as: the Default clause and paragraph (h) of this clause; Termination for Convenience of the Government clause; and the Special Tooling clause....

. Similar provisions in procurement for agencies other than Armed Services appeared in the Federal Property and Administrative Services Act of 1949, 63 Stat. 377, June 30, 1949.

. There had been an earlier version as well. City of Detroit v. Murray Corp., 355 U.S. 489, 517-18 n. 4, 78 S.Ct. 458, 465-66 n. 4, 2 L.Ed.2d 441 (1958) (Whittaker, J., dissenting).

. See, Pasley, The Interpretation of Government Contracts: A Plea for Better Understanding, 25 Fordham L.Rev. 211, 230-40 (1956); Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham L.Rev. 224, 241-42 (1957). See also Bachman, Defense Department Contract Financing, 25 Geo.Wash.L.Rev., 228, 234 (1957).