**In re WINDHAM POWER LIFTS INC., Debtor.**

**QUALITY PLUS EQUIPMENT INC., Plaintiff,**

v.

**WINDHAM POWER LIFTS INC., Defendant.**

**Adv. No. 87–0183–APG.**

United States Bankruptcy Court, M.D. Alabama, S.D.

April 28, 1988.

Ernest H. Hornsby, Johnson, Hornsby, Etheredge and Dowling, Dothan, Ala., M. Lloyd Roebuck, Mobile, Ala., for plaintiff.

C.H. Espy, Jr., Dothan, Ala., for defendant.

## DECISION ON COMPLAINT FOR DECLARATORY JUDGMENT

A. POPE GORDON, Bankruptcy Judge.

The debtor filed a complaint for declaratory judgment to determine the title to property in the possession of the debtor, consisting of component parts, work in process, and completed forklift units. This matter has been submitted on a joint stipulation of facts, opposing briefs and cross motions for summary judgment. This adversary proceeding arises from the following uncontested facts.

On January 2, 1985, the United States government, through Warner Robbins Air Logistics Center, Department of the Air Force (the Government), awarded Contract No. F09603–85–C–0125, a DO priority-rated defense contract, to Quality Plus Equipment Inc. (Quality). On that date Quality was an authorized dealer for Windham Power Lifts Inc. (debtor). Under a dealer's agreement with the debtor, Quality had been specifically authorized by the debtor to bid on government procurement contracts and the debtor would participate in the preparation of bid submissions.

The government contract dated January 2, 1985, provided for the manufacture and delivery of 401 forklifts built to precise specifications. This number was increased from an original number of 234 forklifts.

Under the government contract, Quality was the prime contractor. Quality subcontracted the actual manufacture of the fork-lifts to the debtor. The debtor began manufacture of the forklifts and has delivered, to date, 97 of the 401 units called for under the contract.

The original contract between Quality and the Government, as modified, incorporated by reference, Alternate I, 48 C.F.R. § 52.232–16 (1987). This section provides for the payment to a contractor or subcontractor of "progress payments." These payments are based on costs that accrue to the contractor or subcontractor as the contract progresses. These payments are designed to defray the costs of material, direct labor and other direct in-house costs. Small businesses, such as the debtor, may qualify for progress payments in amounts of up to 95% of the actual costs of production.

The debtor would receive progress payments periodically during the course of the debtor's performance under the contract. The practice between the debtor and Quality with regard to the progress payments was that the debtor would invoice Quality periodically for payment based on debtor's costs. Quality would receive progress payments directly from the government and in turn remit progress payments to the debtor. During the course of performance under the contract, the debtor received approximately $4,660,000 in progress payments.

As a condition of Quality's receipt of progress payments from the Government, section 52.232–16 also provides:

(1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

(2) "Property," as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

The contract, as modified to include the foregoing clause, was entered into by Quality and the Government. The contract is not signed by the debtor.

Upon execution of the contract by Quality and the Government, Quality ordered the debtor to begin production of the forklifts. The order was made by way of a purchase order dated June 19, 1986, signed and accepted by a representative of the debtor. The purchase order contained the following terms:

Forklift, 10,000 # cap @ 48″ L.C. Specifications IAW USAF Contract F09603–85–C–0125.

All terms and conditions of contract F09603–85–C–0125 apply including but not limited to MIL–I–45208A.

Delivery schedule to be negotiated at a later date.

Progress payments available IAW FAR requirements.

Government inspection is required prior to shipment from your plant. Upon receipt of this order, promptly notify the Government Representative who normally services your plan so that appropriate planning for Government inspection can be accomplished.

It is also important to note that the dealership agreement between Quality and the debtor dated April 2, 1982, and modified April 5, 1982, contained the following terms:

A. CASH transactions. As a rule all WINDHAM sales to DEALER will be cash on delivery. The title and right to possession to all items sold hereunder, wherever situated and whatever its mode of attachment to either realty or personality [sic], shall remain WINDHAM'S until full payment in cash has been made therefor and DEALER agrees to do all things and acts necessary to maintain WINDHAM'S right and title therein.

Furthermore, QUALITY is authorized to engage in bidding on United States and Foreign Government acquisitions as approved by WINDHAM or under which a standard piece of WINDHAM equipment might be furnished. Any and all such bidding shall be jointly agreed to by both parties as to price, terms, conditions and responsibilities prior to submission of any such bid. These prices, terms, conditions and responsibilities shall be set forth in writing and executed by both parties prior to initial submission of a bid package. Such agreement shall be executed on an individual basis as pertains to each bid package.

Furthermore, no terms and conditions adversely affecting, through monetary means or in any other way, the daily operation of either WINDHAM or QUALITY shall be agreed to without the concurrence of both parties. QUALITY shall insure that WINDHAM is authorized to maintain direct contact with the applicable Government agency through whatever means possible.

Quality argues that title to the parts, work in process, and completed forklift units in possession of the debtor is vested in the Government by virtue of the title-vesting clause under 48 C.F.R. § 52.232–16 incorporated by reference in the government contract between Quality and the Government. The Government has adopted the position of Quality.

The debtor argues that it was not a party to the contract between Quality and the Government and, therefore, is not bound by its terms and, at best, the contract creates an unperfected security interest lien in the parts, work in process, and completed forklift units.

Two issues present themselves for resolution in this matter:

1. Is the debtor bound by the terms of the contract between Quality and the Government? If so,

2. What is the effect of the title-vesting clause of 48 CFR § 52.232–16?

■ With regard to the first issue, it is the opinion of the court that the debtor is bound by the terms of the contract between Quality and the Government. The purchase order for the forklift units clearly stated that the order was subject to the terms and conditions of Government Contract No. F09603–85–C–0125. The pur-

chase order was signed and accepted by the debtor.

It is undisputed that the debtor actively participated in the bid submission for this particular contract. It is further undisputed that the debtor received substantial progress payments during the course of performance of the contract.

The debtor argues, in brief, that it should not be bound by the Government contract on the basis of a *"[p]urchase order* [that] merely attempts to incorporate some terms of the prime contract *by reference* ... [T]erms ... not made known to the debtor ... in direct derogation to the terms of the prior *Dealers Agreement* between the Debtor and Quality." *Debtor's reply brief* at 2. (emphasis in the original)

The court disagrees with the debtor. A purchase order is a true offer and when a purchase order is accepted, signed, and returned, the contract is formed. *Banner Iron Works Inc. v. Amax Zinc Co. Inc.,* 621 F.2d 883 (8th Cir.1980); *Graham, Van Leer & Elmore Co. Inc. v. Jones & Wood,* 656 F.Supp. 667 (D.D.C.1987).

Construction of the contract between Quality and the debtor must be determined under the laws of Alabama. *Fleming v. Pan American Fire & Casualty Co.,* 495 F.2d 535 (5th Cir.1974). The intention of the contracting parties controls in construing a written contract. *Southern Housing Partnerships Inc. v. Stowers Management Company Inc.,* 494 So.2d 44 (Ala.1986). Intention of the parties is derived from the plain and unambiguous language of the contract itself. *Logan v. Citizens National Bank of Opp,* 460 So.2d 1239 (Ala.1984).

The contract, *i.e.* purchase order, between Quality and the debtor clearly and unambiguously incorporated all terms of Government Contract No. F09603–85–C–0125. It is undisputed that the debtor was aware of the government contract, had actively participated in the acquisition of the contract, and had specifically authorized Quality to bid on such contracts. The incorporation of the terms of the government contract by reference in the purchase order was not ambiguous or uncertain.

The fact that the terms incorporated in the purchase order, are in derogation of the earlier dealer's agreement between the debtor and Quality is of no effect. Under Alabama law, parties to a contract may modify an executory contract as they see fit. *Peoples Bank & Trust v. Coleman,* 736 F.2d 643 (11th Cir.1984).

The purchase order and its terms were a modification of the earlier dealer's agreement. The modification was signed by both parties in accordance with the terms of the dealer's agreement.

In summary, in accordance with the terms of the purchase order, the debtor is bound by the terms of Government Contract No. F09603–85–C–0125. It is undisputed that the government contract incorporates the title-vesting clause set out above.

Now that it is determined that the debtor is bound to the terms of the contract between Quality and the Government, the next question involves the effect of the title-vesting clause. The debtor argues that the clause, at most, creates a security interest in the parts, work in process, and finished goods, and that the security interest has not been perfected under state commercial laws. The debtor cites *United States v. Kimbell Foods Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), where the court held that the federal government must observe the state commercial codes in dealing with private businessmen. In *Kimbell,* the court adopted state commercial law in determining the priority of contractual liens arising from SBA and FHA loan programs with respect to pre-existing private liens.

The court adopted state commercial law because:

> ... [A] national rule is unnecessary to protect the federal interests underlying the loan programs.

*Kimbell,* 440 U.S. at 718, 99 S.Ct. at 1453.

The application of the rule in *Kimbell* is questionable here. What is involved is not a federal loan program, but rather a priority-rated defense contract, and a subcontractor receiving virtually all of its produc-

tion costs by way of progress payments. The "federal interest" to be protected here is markedly different from the interest that concerned the *Kimbell* court. Moreover, and most important, there is a title-vesting clause not found in *Kimbell.*

The title-vesting clause is the vehicle the government chose to protect its interest under the contract. A choice well within its province.

Regardless of whether the reason back of the [title vesting] provision is beneficient or harsh, however, here we have the sovereign making a contract. In the absence of constitutional inhibitions the sovereign can make such contract as it pleases and no one can object.

*In re American Boiler Works,* 220 F.2d 319, 321 (3d.Cir.1955).

Title-vesting clauses are a common part of virtually all government procurement contracts. Federal courts have consistently upheld the validity of title-vesting clauses in government contracts. *United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910); *In re Double H. Products,* 462 F.2d 52 (3d.Cir.1972); *In re American Pouch Foods,* 769 F.2d 1190 (7th Cir.1985). This is particularly so where a contractor has received progress payments during the course of performance of the contract.

It has long been recognized and understood that an "advance payment" is a loan by the Government and can be made "only upon adequate security" … but "partial payments" ["progress payments"] are payments made by the Government in purchase of materials and are authorized when ownership thereto vests in the Government.

*In re American Pouch Foods,* 30 B.R. 1015, 1019 (N.D.Ill.1983); citing *City of Detroit v. Murry Corp.,* 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958).

Courts have upheld title-vesting clauses in government contracts notwithstanding preexisting perfected private liens. *In re Double H. Products, supra.*

The fact situation at bar closely resembles *In re Reynolds,* 68 B.R. 219 (Bankr.W. D.Pa.1986). *Reynolds* involved a declaratory action between the government and a creditor bank over title to parts, materials and inventory of the debtor. The debtor was a subcontractor under a priority-rated defense contract that contained an identical title-vesting clause. After a thorough research of authority the court held:

… [T]hat the title-vesting clause is to be literally applied to all property irrespective of whether it relates to the national security or whether the Government has paid for the … materials. However, when the goods acquired are for the national defense, then the purpose for a title-vesting clause for a literal application of its language is even clearer.

*Reynolds,* 68 B.R. at 224.

Based on the foregoing authority, the court concludes that the title-vesting clause should be literally applied and that the Government possesses full and absolute title to the property covered by the clause.

■ In addition to the issues previously stated, the debtor has raised a number of issues that the court feels are not dispositive but merit a brief discussion. The debtor argues that a prior "blanket lien" on inventory in favor of the creditor SBA defeats the title-vesting clause. This argument is without merit. The title-vesting clause vested title to the goods in the government immediately upon acquisition by the debtor thereby avoiding any prior lien on the material in favor of another creditor. In addition, many courts have held that the title-vesting clause in government contracts defeat preexisting private liens. *In re Double H. Products Corp., supra; In re Reynolds, supra.*

■ The debtor also raises the issue that certain title-passing and seller's-remedies statutes under Alabama commercial law affect the rights of the parties under the government contract.

■ It is the opinion of the court that where the government contract and state commercial law are at odds, the language of the government contract must prevail.

**604**

Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles and liens which they create or permit, all present questions of federal law not controlled by the law of any state.

*In re Double H. Products Corp.*, 462 F.2d at 57, citing *United States v. Allegheny*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

■ The debtor further raises as an issue whether or not the debtor may withhold delivery of the goods to the prime contractor as a remedy under state law upon the prime contractor's breach of the subcontract. It is the opinion of the court that the debtor may not withhold delivery of the goods to the prime contractor acting on behalf of the Government. This is especially so under a DO priority-rated defense contract.

... [T]he Government's right to reclaim incompleted items from a bankrupt defense contractor, where those items may be of critical importance to national defense, cannot be seriously questioned on the basis of ... state [law].

*In re Double H. Products Inc.*, 462 F.2d at 55 n. 2.

■ The debtor also argues that the interests of other creditors, i.e. materialmen and other lienholders, may be superior to the interests of the Government under the contract. The court disagrees. As stated above the title-vesting clause is valid against preexisting private liens to goods covered by the title-vesting clause. Further, it has been held that the title-vesting clause is valid against materialmen claims under state law. *United States v. Ansonia Brass and Copper Co.*, 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910).

■ Finally, the debtor argues that the title-vesting provision constitutes an uncompensated "taking" under U.S. Const. Amend. V. This argument is without merit. In addition to the progress payments already received, the debtor may possess a valid claim against the Government or the prime contractor for any balance due the debtor for performance under the contract.

The parties to this proceeding have filed motions for summary judgment pursuant to Rule 7056, Bankruptcy Rules. The court finds that there is no material fact in dispute and that Quality is entitled to judgment as a matter of law.

A separate judgment will enter.