UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-8144
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HARTEC ENTERPRISES, INC. and
JOSE J. ACEVES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

(July 21, 1992)

Before WISDOM, REYNALDO G. GARZA, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Jose J. Aceves is the president and majority stockholder of appellant Hartec Enterprises, Inc. Both appeal from a conviction of theft of government property, and aiding and abetting the theft of government property, in violation of 18 U.S.C. §§ 641 and 2(b). We reverse.

## FACTS

Hartec is a machine shop and metals-fabricating plant located in Horizon City, Texas. Aceves is a self-educated machinist who established and developed Hartec into a business with a reputation for high quality operations. Hartec garnered the government's scrutiny through an FBI investigation of minority-

controlled government contractors for possible kickbacks to officials of the Small Business Administration. After an initial investigation, the FBI seized virtually all of Hartec's business records and held them for further examination for three years. The FBI found no evidence of any illegal kickbacks.

Appellants were charged in a thirteen-count indictment with making false claims related to certain contracts that Hartec had with the government, and with theft of government property. At the close of the prosecution's case, the trial court entered a judgment of acquittal on all of the counts, except Count IX, the subject of the instant appeal. Count IX charged the theft of certain wire mesh panels that were fabricated by Hartec in fulfillment of a government contract. The government had paid periodic progress payments to Hartec on the contract. The contract called for the fabrication of 13,057 wire mesh panels, to be completed before March 31, 1986. Several extensions were ultimately granted.

In January 1987, Hartec declared 513 of the panels as scrap and sold them to El Paso Machine and Steel Works. The government claims that the sale of these panels amounted to conversion of government property, since progress payments had been made pursuant to the production of these panels. The nature of the government's interest forms the critical inquiry on appeal. The government claims that a title vesting provision of the Federal Acquisition Regulations, incorporated into the contract, effectively transferred ownership of the panels to the government

2

because the panels were manufactured with materials paid for through progress payments.

## THE GOVERNMENT'S INTEREST

The government argued successfully at trial that the panels were the property of the United States. The government relied on a plain language interpretation of the title vesting provision.[1] Accordingly, the government argued that the wire mesh panels which Hartec sold actually belonged to the United States. Aceves concedes that the panels were fabricated with materials purchased with government progress payments, but characterizes the

---

[1] Federal Acquisition Regulation 52.232-16 provides, in pertinent part:

(d)  Title.

(1)  Title to the property described in this paragraph (d) shall vest in the Government.  The vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date.  Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

(2)  "Property" as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to the contract under sound and generally accepted accounting principle and practice.  [including] . . .

(i)  Parts, materials, inventories, and works in progress. . . .

This regulation took effect on April 1, 1984.  Prior to that date Defense Acquisition Regulation, 32 C.F.R. § 163.79-2, which contained a similar title vesting provision, applied.

3

panels as non-conforming goods which should properly be classified as scrap.

Appellants insist that the title vesting clause should not be interpreted literally, primarily relying on <u>Midland Marine Bank v. United States</u>, 231 Ct. Cl. 496, 687 F.2d 395 (1982), <u>cert. denied</u>, 460 U.S. 1037 (1983). In <u>Midland Marine Bank</u>, the court considered the history and purpose of the Defense Acquisition Regulations, concluding that the word "title" should not be read literally because the regulations specifically exempted the government from most incidents of ownership. The court determined that the title vesting provision was originally enacted as an expedient to avoid the effects of an 1823 congressional prohibition on advancing federal funds to government contractors. <u>Midland Marine Bank</u>, 687 F.2d at 400-01. The title vesting provision was based on the rationale that if the government took title to materials at the time of purchase, there would technically be no advance of funds to the contractor. <u>See</u> C.S. McClelland, <u>The Illegality of Progress Payments As a Means of Financing Government Contractors</u>, 33 Notre Dame L. Rev. 380 (1958) (cited in <u>Marine Midland Bank</u>, 687 F.2d at 401). <u>See also</u> 31 U.S.C. § 529 ("No advance of public money shall be made in any case unless authorized by the appropriation concerned or other law."). In 1958, Congress abolished this prohibition and authorized progress payments to federal government contractors. <u>Marine Midland Bank</u>, 687 F.2d at 401. In view of this amendment, the <u>Marine Midland Bank</u> court reasoned that the title vesting provision should no longer be

literally construed.  Instead the provision should be understood as a security interest in the underlying collateral.

> [T]he government's title vesting clause and regulations provide for the taking of an interest in the nature of a lien.  Full title, in the plain sense, certainly is not meant, as an examination of the clause and regulations show.  We recognize that the government's use of the word "title" has had an important history, both to avoid the ban on advances of public money and as a way to circumvent floating lien interests of general creditors, and that it has an important present use in insuring that the government may take actual possession of the inventory of a bankrupt contractor.  There is no reason, however, in theory or in case law, to read the word for more than that.

Midland Marine Bank, 687 F.2d at 403-04.

In construing the progress payments as a series of loans, rather than a partial purchase, the court concluded that the title vesting provision "makes clear that the government does not take ownership to recover inventory in any normal sense of the word." Midland Marine Bank, 687 F.2d at 399.  For example, the court noted that a government contractor may sell scrap without the government's approval; that upon completion of the contract, title will revest in the contractor for covered material that was not incorporated in the final product; that any inventory-related loss associated with the covered inventory would fall on the contractor, and not the government; and, that in the event of default, the government may force the revesting of inventory in the contractor by compelling a repayment of progress payments.  Id.  Thus, while the government had certain possessory rights in the inventory

5

funded by progress payments, that type of possessory interest is inconsistent with the traditional notion of ownership.

> "Title" is meant to carry no risks for the government and is shifted back to the contractor when it would be unneeded or undesired. In short, the government takes an interest in the contractor's inventory but does not want, and does not take, any of the responsibilities that go with ownership.

Id.

In contrast, the government relies on In re American Pouch Foods, Inc., 769 F.2d 1190 (7th Cir. 1985), cert. denied, 475 U.S. 182 (1986). The Seventh Circuit engaged in a review of the history of the title vesting provision, following the same path as the Marine Midland Bank court, but reaching a contrary conclusion. The Seventh Circuit acknowledged the reasonableness of the Marine Midland Bank holding but believed that the title vesting provision was written with an intent toward literal interpretation. American Pouch Foods, 769 F.2d at 1196. American Pouch Foods is, however, distinguishable on a number of fronts.

Primarily, the court's conclusion that the Marine Midland Bank decision stands in error is dicta. The court conceded that "application of the Marine Midland rule to the present case would produce the same result we reach. . . ." American Pouch Foods, 769 F.2d at 1196. Second, American Pouch Foods was a bankruptcy case, in which the government sought relief from the automatic stay to regain the possession of foodstuffs prepared under a military contract. Third, unlike the instant case, no person's liberty hinged on the court's interpretation of the title vesting

6

provision. In American Pouch Foods, the issue was whether the government was entitled to possession of the property upon termination of the government contract, not title to the property. American Pouch Foods, 769 F.2d at 1196. The Marine Midland Bank court acknowledged that its holding did not disturb the government's right of possession. "[T]he government's right to possess such property cannot be questioned, and it is entirely accurate and appropriate for an opinion in a case that is solely on possession to recite that 'title means title.'" Marine Midland Bank, 687 F.2d at 400.[2]

We find the reasoning of Marine Midland Bank v. United States to be compelling in this criminal case. The government neither demanded nor accepted any of the traditional incidents of title with regard to Hartec. See Marine Midland Bank, 687 F.2d at 399. While the title vesting provision would assist the United States to regain possession of inventory wrongfully sold to a third party, just as a lien holder could properly recover such goods wrongfully held by another, it was unjust to convict defendants in the instant case of "stealing" property that the government did not own.[3] This is also a paradigmatic case for application of the rule

---

[2]    The government also cites United States v. Digital Products Corp., 624 F.2d 690 (5th Cir. 1980), a similarly distinguishable case which turned on title as possession, not title as ownership. Moreover, Digital Products Corp. was a case where the government was attempting to replevy goods for which it had contracted after the contract had been terminated, and not a criminal prosecution. Digital Products Corp., 624 F.2d at 692.

[3]    Even after criticism of the Marine Midland Bank decision by the Seventh Circuit and a few bankruptcy courts, see e.g., In re Coded Sales, Inc., 112 B.R. 560, 562 (Bankr. S.D.N.Y.

7

of lenity. The rule of lenity compels us to construe ambiguous criminal statutes in favor of lenity. <u>Dowling v. United States</u>, 473 U.S. 207, 229 (1985). The rule promotes fair notice of prohibited conduct and reduces the likelihood that unintentionally criminal conduct will be penalized. <u>United States v. Kozminski</u>, 487 U.S. 931, 952 (1988). Although the rule does not require that we give the statute its narrowest construction, <u>United States v. Chen</u>, 913 F.2d 183, 189 (5th Cir. 1990), we find that under the facts now before us, the coupling of the title vesting provision with its inconsistent interpretations in the courts and § 641 did not provide Aceves with notice that he could be criminally liable for sale of the wire mesh panels.

The government contends that even if its interest in the property is characterized as a security interest, appellants' convictions may still be upheld because the government retained sufficient control over the property to support a theft action. <u>See</u> <u>United States v. Faust</u>, 850 F.2d 575, 579 (9th Cir. 1988). ("Government must have 'title to, possession of, or control over' the [property] involved" in order to convict under § 641) (quoting <u>United States v. Johnson</u>, 596 F.2d 842, 846 (9th Cir. 1979)). <u>But cf.</u>, <u>United States v. Tana</u>, 618 F.Supp. 1393, 1395 (S.D.N.Y. 1985)

_____

1988); <u>In re Reynolds Manufacturing Co.</u>, 68 B.R. 219, 224 (Bankr. W.D.Pa. 1986), the United States Claims Court has recognized the continuing authority of the <u>Marine Midland Bank</u> holding. <u>First National Bank of Geneva v. United States</u>, 13 Cl. Ct. 385, 387 (1987); <u>Welco Industries, Inc. v. United States</u>, 8 Cl. Ct. 303, 305-06 (1985). Moreover, the drafters of the Federal Acquisitions Regulations have proposed an amendment to conform the FAR to the <u>Marine Midland Bank</u> decision. 54 Fed. Reg. 18,631 (May 1, 1989).

(government's position that security interests can be subject of prosecution under § 641 is "plainly wrong").

There is substantial credible evidence in the record that Aceves had reason to believe that the government retained control over the wire mesh panels. One of Hartec's clerical employees, who also assisted with government contracts, told Aceves that she believed the wire mesh panels belonged to the government. Another employee advised Aceves to consult with the government contract officer before selling the material declared as scrap. However, the government's expert witness on the Federal Acquisition Regulations testified that a contractor is vested with the discretion to make the determination whether an item is scrap or not, although there may be a review process. However, we need not determine whether a security interest is a thing of value of the United States, the theft of which may impose criminal liability under § 641. Count IX of the indictment charged that defendants "did knowingly and willfully embezzle, steal, purloin, and convert . . . wire mesh panels." The government did not indict appellants on the theory that they deprived the government of property over which the government exercised sufficient control to constitute theft of government property. The government also failed to introduce proof supporting a control theory, and has thus waived this possible theory of liability. See also United States v. Gordon, 638 F.2d 886, 889 (5th Cir. Unit B), cert. denied, 452 U.S. 909 (1981) (in construing "thing of value of the United States" "[t]he word 'of' necessarily implies ownership. Things 'of' the

9

Government, in the sense of the statute, are property of the Government").[4]

The government also urges before the court evidence that Hartec was in serious financial straits at the time Aceves sold the scrap material to El Paso Machine & Steel Works and that Hartec's books were in disarray. Not only did Aceves benefit from the opinion of at least two Hartec employees that the materials could not be sold as scrap without at least contacting the government contract administrator, Aceves was also required to credit the proceeds from the sale to the government's account. This he did not do. The circumstances surrounding the sale of the scrap suggest that Aceves may have acted out of desperation and in hopes of temporarily alleviating Hartec's business woes. However correct the government may be in their assertion that the wire mesh panels could not be unilaterally declared scrap, this argument has no application. We have already held that the title vesting provision gives rise to no more than a security interest in the goods for which the government has contracted and advanced progress payments, and that no criminal liability under § 641 may attach on the facts of this case for "theft of a security interest."

**CONCLUSION**

---

[4] Appellants also ask us to find § 641 as applied in this case to be unconstitutional because of its vagueness, citing Tana, 618 F.Supp. at 1397 (finding that § 641, as applied to theft of security interests, may be void for vagueness). Because we reverse appellants' convictions on other grounds we need not reach this issue.

We agree with the district court that "this is not the kind of case that ought to have been tried.  What this case should have been . . . is a suit by the . . . government contracting agency against the defendant of a civil nature as opposed to a criminal nature."  The government indicted appellants on the theory that the title vesting clause truly vested title, and gave full ownership rights to the government for materials upon which progress payments had been advanced.  The title vesting provision of the Federal Acquisition Regulations creates no more than a security interest in the government's favor, and cannot be, under the facts of this case, a basis for prosecution under 18 U.S.C. § 641.  Appellants' convictions are **REVERSED**.