UNITED STATES of America, Plaintiff,

v.

Salvador **RIBAS DOMINICCI**, Defendant.

Crim. No. 93–067 (SEC).

United States District Court,
D. Puerto Rico.

Sept. 20, 1995.

Miguel A. Pereira, Assistant U.S. Attorney, U.S. Attorney's Office, Criminal Division, Hato Rey, PR, for Plaintiff.

Hugo Rodriguez–Diaz, Bayamon, PR, Alan Ellis (Pro Hac Vice), Philadelphia, PA, for Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

The defendant, Salvador Ribas Dominicci ("Ribas"), has been indicted on five counts of stealing, converting and selling government property in violation of 18 U.S.C. § 641. He now moves this Court to strike an insufficient allegation and prejudicial surplusage, and to dismiss the indictment because it fails to charge an offense. The case is before the Court on remand from the First Circuit, directing withdrawal of defendant's previously tendered plea of guilty. *United States v. Ribas–Dominicci*, 50 F.3d 76 (1st Cir.1995).

For the purpose of his motion to dismiss, Ribas accepts, as he must, that the properly pleaded facts set forth in the indictment are true. The indictment alleges that in 1987, the United States Department of Defense awarded a contract to Quality Manufacturing, Inc. ("Quality"), a corporation owned and controlled by Ribas, for the manufacture of 1,692,120 pairs of military trousers. Under the terms of the contract, the government made periodical progress payments totalling approximately $9,600,000.00. The indictment alleges that the U.S. received in return from Ribas' corporation goods and services amounting to approximately $9,200,000.00.

The indictment further alleges that title or ownership of the items manufactured under the contract passed to the United States not later than final inspection and approval by the government.

 Count One of the indictment charges that Ribas did willfully and knowingly steal, convert and sell to a third party 16,135 pairs of trousers worth approximately $227,000.00, which were the goods and property of the United States. Count Two contains the same allegations as to 4,200 pairs of trousers worth around $59,000.00. Count Three has similar charges as to 10,019 pairs of trousers worth about $141,000.00. Count Four alleges the same as to 600 pairs valued at around $8,000.00. Finally, Count Five charges the theft and sale to a third party of 336 pairs of trousers worth approximately $4,500.00.

Ribas argues that even accepting as true the factual allegations of the indictment, these averments do not establish that the trousers were "things of value of the United States", as required for conviction under the statute. In response, the government claims that a title vesting provision of the Federal Acquisition Regulations, incorporated into the contract, effectively transferred ownership of the trousers to the government because the trousers were manufactured with materials paid for through progress payments.

Clearly, resolution of this matter hinges at least in part on the precise nature of the government's interest over the subject property. If the government took title to the trousers in the traditional sense, then the merchandise arguably constitutes a "thing of value" of the United States, and prosecution under 18 U.S.C. § 641 for its conversion, theft or unauthorized sale is proper. On the other hand, if the government took only a lien interest over the property, instead of traditional title, then as a matter of law, prosecution under § 641 is improper. The title vesting clause at issue provides in pertinent part as follows:

[d] Title

[1] Title to the property described in this paragraph shall vest in the Government. Vestiture shall be immediately

upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

[2] "Property" as used in this clause, includes all of the below described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

48 C.F.R. § 52.232–16.

According to the government's interpretation of the clause, since there is no dispute that the property here in question was manufactured by Ribas under contract with the Department of Defense, and that the costs of manufacture were borne by the government, the trousers are "properly chargeable" to the contract as they are manufactured, and it is then that title vests in the United States. For his part, defendant cites *United States v. Hartec,* 967 F.2d 130 (5th Cir.1992), in support of his contention that no violation of § 641 arises from his sale of the trousers because progress payments made by the government under a procurement contract do not vest it with title as to the goods being manufactured, but rather gives the United States only a security interest over the property. He also points out that the contract provided for delivery FOB destination, therefore all responsibilities associated with the risk of loss of the merchandise remained with the contractor until acceptance by the government after delivery to agreed upon destinations. Consequently, as in *Hartec,* all of the traditional incidents of title remained with Quality until delivery.

In *Hartec,* a strikingly similar case to the present one, the Fifth Circuit reversed defendants' convictions under 18 U.S.C. § 641, expressly holding that they could not be convicted based on their sale to a third party of wire mesh panels which had been constructed from materials purchased with funds advanced by the government in accordance with a government contract. The Fifth Circuit reasoned that the title vesting provision of the Federal Acquisition Regulations which, as in this case, had been incorporated into

the contract, created no more than a security interest in the government's favor, and could not form the basis for prosecution under 18 U.S.C. § 641. *Hartec,* 967 F.2d at 134–135. In so holding, the Fifth Circuit relied on the rationale of *Marine Midland Bank v. United States,* 231 Ct.Cl. 496, 687 F.2d 395 (1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983), finding that the title vesting clause should not be interpreted literally. *Hartec,* 967 F.2d at 132.

In *Marine Midland Bank,* the court considered the history and purpose of the defense acquisition regulations, concluding that the word "title" should not be read literally because the regulations specifically exempted the government from most incidents of ownership. *Marine Midland Bank,* 687 F.2d at 399. In addition, the court determined that the history of the defense acquisition regulations demonstrates that the title vesting provision was enacted to avoid a congressional prohibition on advancement of monies to government contractors—a prohibition that has since been abolished. *Id.* at 400–401. In light of the removal of its underlying purpose, and the fact that the government never accepted any of the traditional incidents of title, the court held that the provision should be understood as providing only a security interest in the underlying collateral. *Id.* at 401; *Hartec,* 967 F.2d at 132.

Relying on *Hartec* and *Marine Midland Bank,* defendant now presses the argument that because the government's progress payments did not vest it with title to the goods being manufactured under the contract, but rather only with a security interest, these payments did not render the trousers "things of value of the United States", one of the required elements of an offense under 18 U.S.C. § 641. *See United States v. Alessio,* 439 F.2d 803, 803–804 (1st Cir.1971); *United States v. Lawson,* 925 F.2d 1207 (9th Cir. 1991). Consequently, defendant urges the Court to dismiss the indictment for failure to charge an offense.

In contrast, the government relies, as it did unsuccessfully in *Hartec,* on the rationale of *In re American Pouch Foods, Inc.,* 769 F.2d 1190 (7th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716

(1986), where the Seventh Circuit held in a bankruptcy case that the title vesting clause gives the government "absolute title" to property acquired with funds derived from progress payments made by the government. After an extensive review of the history of the title vesting provision, as well as the statutory and regulatory framework surrounding the progress payment clause, the court addressed the reasoning in the *Marine Midland Bank* decision, finding it unpersuasive as a basis for denying the government's ownership claim. *Id.* at 1196. It found that the history of contract financing under government procurement supported the position that the government acquires title to the property object of the contract when the same is properly allocable or chargeable to that contract. *Id.* at 1195. Moreover, discussing the holding in *Marine Midland Bank*, the court discounted the argument made in that case that the title vesting provision came about as an attempt to circumvent congressional prohibitions existing prior to 1958 that limited the availability of progress payments to facilitate the procurement of goods. *American Pouch Foods*, 769 F.2d at 1196. Rather, concluding that progress payments had long been accepted as within the law, the court held that the title vesting clause should be taken literally. *Id.* Several bankruptcy decisions have followed this rationale and have reached the similar conclusion that the government acquires full title to and ownership of all property chargeable to the procurement contract under the provisions of the progress payment clause. *See Quality Plus Equipment, Inc. v. Windham Power Lifts, Inc.*, 91 B.R. 598 (Bankr. M.D.Ala.1988); *U.S. v. Economy Cab & Tool Co.*, 47 B.R. 708 (Bankr.D.Minn.1985); *U.S. v. Wincom Corporation*, 76 B.R. 1 (Bankr. D.Mass.1987).

As noted by the court in *Hartec* however, *American Pouch Foods* is distinguishable in several respects from a case, such as this one, in the nature of a criminal prosecution. First, *American Pouch Foods* was a bankruptcy case in which the government sought relief from the automatic stay to regain the possession of foodstuffs prepared under a military contract. *Hartec*, 967 F.2d at 133. In contrast, a person's liberty hinges on this Court's interpretation of the title vesting provision. *Id.* Furthermore, the issue in *American Pouch Foods* was whether the government was entitled to possession of the goods upon termination of the contract, not title to the property. Here, we are not concerned with the government's right to possession, but rather with the question whether the government had, at the time of their transfer to third parties, rightful title to and ownership of the trousers, so as to render them "things of value" of the United States for purposes of a criminal prosecution under 18 U.S.C. § 641.

Moreover, this is a case where the purposes underlying the rule of lenity—to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors and courts—are certainly served by its application. *See U.S. v. Kozminski*, 487 U.S. 931, 952, 108 S.Ct. 2751, 2764, 101 L.Ed.2d 788 (1988). In this respect, it is telling that the government itself appears unsure as to the exact point in time when it became entitled to ownership of the trousers. For example, the indictment alleges that title over the trousers passed to the United States "not later than final inspection and approval for shipment" by government quality assurance inspectors. In its Response to defendant's motion to dismiss the indictment however, the government now claims that title passed to it upon manufacture of the items, by virtue of the progress payments advanced to Quality. The regulation in turn merely provides that vestiture occurs when the property is or should have been allocable or properly chargeable to the contract. This apparent uncertainty lends support to defendant's argument that due to the ambiguity resulting from the necessary coupling of the title vesting provision and § 641, due process principles embodied in the rule of lenity require a finding that Ribas was not provided with fair notice that he could be criminally liable for the sale of the trousers to other customers.

■ The rule of lenity reflects the understanding that "a fair warning should be given to the world, in language that the common world will understand, of what the law in-

tends to do if a certain line is passed." *United States v. Bass,* 404 U.S. 336, 347–350, 92 S.Ct. 515, 522–523, 30 L.Ed.2d 488 (1971) (quoting *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931)). The rule compels us to construe ambiguous criminal statutes in favor of lenity. *Dowling v. United States,* 473 U.S. 207, 229, 105 S.Ct. 3127, 3138, 87 L.Ed.2d 152 (1985). Here, we find that the inconsistent interpretations given by the courts to the threshold issue of the effect of the title vesting provision on the property at issue [1], coupled with the significant penalties to which Ribas would be subject under 18 U.S.C. § 641 if found guilty, particularly as compared to the relatively less disruptive effect of the consequences of a bankruptcy court judgment, call for the application of the rule of lenity. We hold that under these circumstances, these statutes and regulations taken together did not provide fair notice of prohibited conduct in this case. This conclusion is all the more compelling, given the fact that the only published opinion in a criminal case of this nature which squarely deals with these issues holds that title does not pass to the government solely by virtue of the progress payment clause.

For these reasons, we are persuaded by the *Hartec* rationale, as it applies in the context of this criminal prosecution. We hold that the title vesting provision incorporated into the contract between Quality and the government created no more than a security interest in the government's favor, and cannot form the basis for prosecution under 18 U.S.C. § 641. Accordingly, the indictment against Ribas must be DISMISSED.

**SO ORDERED.**

---

**1.** Compare *Skip Kirchdorfer, Inc. v. U.S.,* 6 F.3d 1573, 1581 (Fed.Cir.1993); *U.S. v. Hartec,* 967 F.2d 130 (5th Cir.1992); *First National Bank of Geneva v. U.S.,* 13 Cl.Ct. 385, 387 (1987); *Welco Industries, Inc. v. United States,* 8 Cl.Ct. 303, 305–306 (1985); *Marine Midland Bank v. United States,* 231 Ct.Cl. 496 (1982); *U.S. v. Tana,* 618 F.Supp. 1393 (S.D.N.Y.1985) with *In re American Pouch Foods, Inc.,* 769 F.2d 1190 (7th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986); *In re Coated Sales, Inc.,* 112 B.R. 560, 562 (Bankr.S.D.N.Y.1988); *Quality Plus Equipment, Inc. v. Windham Power Lifts, Inc.,* 91 B.R. 598 (Bankr.M.D.Ala.1988); *U.S. v. Wincom Corporation,* 76 B.R. 1 (Bankr.D.Mass. 1987); *In re Reynolds Manufacturing Co.,* 68 B.R. 219, 224 (Bankr.W.D.Pa.1986); *U.S. v. Economy Cab & Tool Co.,* 47 B.R. 708 (Bankr. D.Minn.1985).